# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JER HUDSON GP XXI LLC and HUDSON HOUSING TAX CREDIT FUND XXI LP, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2021-0478-MTZ |
| DLE INVESTORS, LP, | ) ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: January 6, 2022
Date Decided: May 2, 2022

James P. Hughes, Melanie K. Sharp, Craig D. Gear, and Richard J. Thomas, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Jessica Ragosta Early, Emily A. Robey-Phillips, HOLLAND & KNIGHT LLP, Boston, Massachusetts; *Attorneys for Plaintiffs JER Hudson GP XXI LLC and Hudson Housing Tax Credit Fund XXI LP*.

Christopher Viceconte, GIBBONS P.C., Wilmington, Delaware; Louis E. Dolan, NIXON PEABODY LLP, Washington, DC, Laura B. Bacon, NIXON PEABODY LLP, Chicago, IL; *Attorneys for Defendant DLE Investors, LP*.

**ZURN, Vice Chancellor.**

For over three decades, the federal government has created tax subsidies to promote the development and maintenance of affordable rental housing. Under this program, tax credits are allocated to each state, which in turn allocate the tax credits to qualified affordable housing projects. The tax credits are passed along to investors in those projects, thereby incentivizing investment in affordable housing.

Affordable housing projects in this program are typically held by a limited partnership. The investors purchase limited partnership interests, and a general partner manages the partnership and the property. Investors claim the tax credits allocated to the property in which they invest over a period of ten years. After that period expires and the investors have received their tax credits, the investors frequently sell their limited partnership interests for much less than they paid for them. The program has additional mandates and features that support keeping the property as affordable housing for an additional twenty years, including a means of transferring the property to a qualified affordable housing nonprofit at a below-market price.

Recently, a new type of buyer has emerged to buy the investors' discounted limited partnership interests. It purchases a limited partnership stake from the initial investor after the investor harvested the property's tax credits. As a new limited partner, the buyer engages in a now-nationally-familiar pattern of tactics to prevent the property from being transferred to the nonprofit. Around the country, about half

1

a dozen courts have weighed in on the propriety of those strategies under the federal tax subsidy program. This precedential opinion contributes to that body of law through the lens of fiduciary duties and the internal affairs of Delaware limited partnerships.

The plaintiffs here are the partnership and general partner; the defendant is the new limited partner. The new limited partner repeatedly sought either a sale of the property or a buyout of its partnership interests at what it considered fair market value. When the general partner would not go along, the limited partner claimed the general partner's response to the property's disposition to a nonprofit amounted to a breach of fiduciary and contractual duties under the limited partnership agreement. The limited partner attempted to remove the general partner for cause, as is its right under that agreement. The general partner seeks a declaratory judgment that it was not validly removed. The limited partner asserts counterclaims for breach of fiduciary duty, breach of contract, and declaratory relief that the removal was valid.

This post-trial opinion finds in favor of the general partner and the partnership. The general partner's authority and duties are circumscribed by the partnership agreement. The general partner has modified fiduciary duties, but the limited partner failed to prove the general partner breached them. The limited partner also failed to prove the general partner breached the limited partnership agreement. Therefore, the limited partner lacked cause to remove the general partner. The removal is

2

invalid, the general partner remains in its role as the general partner, and the general partner is not liable for any breach. The limited partnership agreement dictates that the general partner receive fees and expenses for surviving an unwarranted removal attempt.

## I. BACKGROUND[1]

Plaintiff Hudson Housing Tax Credit Fund XXI LP (the "Fund") is a limited partnership that holds indirect interests in other limited partnerships, each of which in turn holds an affordable housing property developed under the federal Low-Income Housing Tax Credit ("LIHTC") program.[2] The other plaintiff, JER

---

[1] Citations in the form of "Compl. —" refer to the Complaint, available at Docket Item ("D.I.") 1. Citations in the form of "Countercl. —" refer to the Counterclaims, available at D.I. 24. Citations in the form of "PTO —" refer to the Stipulated Facts that are Admitted and Require No Proof in the parties' Joint Pre-Trial Stipulation and Order, available at D.I. 163 from pages 12 through 30. Citations in the form of "Trial Tr. —" refer to the trial transcript, and citations in the form of "Last Name Tr. —" refer to the trial testimony of the identified witness, available at D.I. 179 and D.I. 180. Citations in the form of "JX —" refer to joint trial exhibits. Citations in the form of "Fund LPA —" refer to the Amended and Restated Agreement of Limited Partnership of Hudson Housing Tax Credit Fund XXI LP dated September 30, 2002, Assignment and Assumption Agreement (the "Initial Fund LPA") and First Amendment to Amended and Restated Agreement of Limited Partnership [Hudson Housing Tax Credit Fund XXI LP] dated December 31, 2007 (the "First Amendment"), available at JX009 HUDSON00018177–238 and HUDSON00018158–74, respectively. Citations in the form of "First Amendment —" refer the First Amendment alone, at JX009 HUDSON00018158–74. Citations in the form of "Property LPA —" refer to the Amended and Restated Agreement of Limited Partnership and Amendment to Amended and Restated Agreement of Limited Partnership of Kate's Trace Limited Partnership, available at JX007 HUDSON00018375–463 and HUDSON00018360–65, respectively. Citations in the form of "Post-Trial Tr. —" refer to the Post-Trial Oral Argument Transcript, available at D.I. 195.

[2] PTO ¶¶ 2, 12–14.

3

Hudson GP XXI LLC ("Fund GP"), is the Fund's general partner (together with the Fund, "Plaintiffs").[3] The Fund was created in 2002.[4] Defendant DLE Investors, LP ("DLE") is one of the Fund's limited partners. DLE became a Fund limited partner in 2007.[5] The Fund distributed all tax credits flowing from one particular property to its investors by 2015.[6] The partners projected that between 2020 and 2021, that property would be transferred to a nonprofit for a below-market price pursuant to the LIHTC program and the partnership agreement of the entity holding the property.[7]

By 2020, new owners had taken control of DLE.[8] Under new management, DLE sought either a sale of the property or a buyout of its Fund interest at fair market value.[9] Fund GP declined both transactions. The partnership holding the property,

---

[3] *Id.* ¶¶ 1, 14.

[4] *Id.* ¶ 16.

[5] *Id.* ¶ 17.

[6] *Id.* ¶ 41; Trane Tr. 522; Macari Tr. 33, 87.

[7] JX014 at DLE_0007799–801; JX058 at DLE_0002308.

[8] Chiusano Tr. 388–89; Kagey Tr. 483–84; Trane Tr. 522–23.

[9] JX062 at DLE_0002407; JX075 at DLE_0002601.

DLE objected to the admissibility of JX062 in a footnote in its post-trial answering brief. D.I. 188 at 31 n.10. That objection is waived: DLE failed to object to JX062 on the Joint Exhibit List. D.I. 169 at 4. Under the Joint Pre-Trial Stipulation and Order,

in which the Fund held indirect limited partner interests, proceeded to transfer the property to an affordable housing nonprofit as contemplated by the LIHTC program and that partnership's governing documents.[10] Fund GP sought the advice of counsel and concluded it would not challenge the transfer.[11] In response, DLE purported to remove Fund GP as general partner of the Fund, asserting its inaction was a breach of fiduciary and contractual duties, including a duty to seek DLE's consent.[12] Fund GP contends it breached no such duty and was improperly removed.[13]

Having weighed the evidence and evaluated the credibility of the witnesses, I find that the facts presented at trial support Plaintiffs' position. The following facts

---

Objections to exhibits shall be noted on the Joint Exhibits List or made at trial (if an exhibit is sought to be admitted into evidence at trial). Unless specifically raised during trial, any continuing objections to exhibits on the Joint Exhibit List shall be briefed in post-trial briefing or be deemed waived. All exhibits on the Joint Exhibit List to which an objection is not raised in accordance with this paragraph shall be deemed admitted into evidence.

D.I. 163 at 39; *see also* Trial Tr. 89 ("THE COURT: [A] contemporaneous objection needs to be lodged, it needs to be consistent with any objection that's on the JX list, and then, in the absence of an objection, the exhibit is in evidence.").

[10] PTO ¶ 55; JX168.

[11] *See* PTO ¶ 58; JX203 [hereinafter "Holland & Knight Memorandum"].

DLE objected to my consideration of the Holland & Knight Memorandum as hearsay under Delaware Rules of Evidence 801 and 802. D.I. 169 at 11; Trial Tr. 145. The Holland & Knight Memorandum is a summary of legal advice Plaintiffs received from Holland & Knight. Plaintiffs indicated at trial that the Holland & Knight Memorandum is not being admitted for the truth of the matter asserted. Trial Tr. 145–46. It is therefore not hearsay under Rule 801(c)(2). *Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co., Inc.,* 866 A.2d 1, 21 (Del. 2005); D.R.E. 801(c)(2). DLE's objection is overruled.

[12] PTO ¶ 60; JX218.

[13] PTO ¶ 62; JX220.

were proven by a preponderance of the evidence presented at trial or are drawn from judicially noticeable authority.[14]

## A. The Low-Income Housing Tax Credit Program

More background about the LIHTC program may be helpful context. The LIHTC program is designed to encourage new construction and rehabilitation of existing buildings as affordable rental housing.[15] It is set forth in Section 42 of the Internal Revenue Code ("Section 42").

---

[14] *See* D.R.E. 202.

[15] 26 U.S.C. § 42. Since the Wagner-Steagall Act of 1937, the federal government has experimented with a wide variety of methods to address home insecurity. *E.g.*, United States Housing Act of 1937, Pub. L. No. 75-412, 50 Stat. 888 (codified as amended in scattered sections of 42 U.S.C.). Methods include: "i) publicly-financed, publicly-owned housing starting in the 1930s (public housing); ii) publicly-financed, privately-owned housing starting in the 1950s . . . ; iii) vouchers starting in the 1970s; and finally, iv) tax credits since 1986." Brandon M. Weiss, *Residual Value Capture in Subsidized Housing*, 10 HARV. L. & POL'Y REV. 521, 524 (2016) [hereinafter "*Residual Value Capture*"] (citations omitted).

As set forth in Section 42, the LIHTC program is a federal subsidy program specifically designed to promote the nationwide development and preservation of rental housing that is affordable to low and moderate income households. The LIHTC program subsidizes low-income housing by: (1) making available to a "qualified low-income housing project" tax credits, which provide a dollar-for-dollar income tax reduction; and (2) permitting institutional investors with large, annual, and predicable income tax obligations (known as "tax credit investors"), such as banks, to acquire these tax credits in exchange for providing capital necessary to develop the project.[16]

The Supreme Judicial Court of Massachusetts has described the LIHTC program as "the most important source of financing for affordable housing . . . across the nation."[17]

---

[16] *Opa-Locka Cmty. Dev. Corp. v. HK Aswan, Inc.*, 2020 WL 4381624, at *3 (Fla. Circ. Ct. July 7, 2020) (ORDER) (citing U.S. GOV'T ACCOUNTABILITY OFF., GAO-17-285R, LOW INCOME HOUSING TAX CREDIT: THE ROLE OF SYNDICATORS 1, 4 (Feb. 16, 2017)), *aff'd sub nom. Aswan Vill. Assocs., LLC v. Opa-Locka Cmty. Dev. Corp., Inc.*, 2021 WL 4190914 (Fla. Dist. Ct. App. Sept. 15, 2021).

[17] *Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.*, 99 N.E.3d 744, 748 (Mass. 2018) ("[The] LIHTC program now provides more affordable rental units than are provided in public housing or with Section 8 housing vouchers[.]" (citing *America's Rental Housing: Expanding Options for Diverse and Growing Demand*, JOINT CTR. FOR HOUS. STUD. OF HARVARD UNIV., 32–33 (2015), https://www.jchs.harvard.edu/sites/default/files/media/imp/America%27s%20Rental%20 Housing%202015_WEB.pdf)); *accord Low Income Housing Tax Credit Program, 2018– 2019 Qualified Allocation Plan*, MASS. DEPT. OF HOUS. & CMTY. DEV. 6, https://www.mass.gov/doc/2018-2019-qap/download (explaining that since 1987, the LIHTC program has helped finance over 67,000 affordable rental units in Massachusetts and almost 3 million nationwide); *Residual Value Capture* at 524–25 ("At an annual cost of approximately eight billion dollars, the LIHTC program is by far the predominant source of government investment in rental housing development for low-income households." (citing JOINT COMM. ON TAX'N, JCX-97-14, ESTIMATES OF FEDERAL TAX EXPENDITURES FOR FISCAL YEARS 2014–2018 26 (2014))).

The LIHTC program is built on federal allocations of tax credits to state housing finance agencies in all fifty states.[18] The state agencies award tax credits to real estate developers who win a competitive application process to develop affordable housing.[19] The nonrefundable tax credits are valuable to large financial institutions with significant federal tax liabilities.[20] Those investors' capital contributions provide necessary equity to develop the qualified affordable housing property.[21] "[D]evelopers 'sell' the tax credits to private investors, usually through a syndicator, in exchange for an equity investment in the housing project."[22] Those syndicators connect investors to affordable housing projects offering tax credits.[23]

---

[18] *Residual Value Capture* at 534.

[19] *Id.*

[20] *Id.*

[21] *Id.* at 534–35.

[22] *Acevedo v. Musterfield Place, LLC*, 98 N.E.3d 673, 675 (Mass. 2018) (Jill Khadduri, Carissa Climaco, & Kimberly Burnett, *What Happens to Low–Income Housing Tax Credit Properties at Year 15 and Beyond?*, U.S. DEPT. OF HOUS. & URB. DEV. 2 (2012), https://www.huduser.gov/publications/pdf/what_happens_lihtc_v2.pdf); *see also Residual Value Capture* at 537 n.79 ("Beginning in the early 1990s, a corporate equity market began to develop as institutional investors began to understand the asset class, the housing tax credit program was made permanent, and syndicators quickly came to prefer institutional capital as a more efficient way to raise equity.").

[23] *See, e.g.*, *In re Mun. Mortg. & Equity, LLC, Sec. & Deriv. Litig.*, 876 F. Supp. 2d 616, 626–27 (D. Md. 2012) ("Federal income tax law includes LIHTCs to provide an incentive for developers to construct low-income rental housing. Frequently, low-income housing developers find it advantageous to sell these tax credits to a syndicator. The syndicator will form an investment fund (an 'LIHTC Fund') to invest in the developer's low-income housing projects. The syndicator will assemble a group of investors to invest in the LIHTC Fund and obtain the benefit of the tax credits."), *aff'd sub nom. Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014); *Residual Value Capture* at 535 n.65 ("The process typically is more complex, because once the 'lower-tier' investor closes on the tax

The syndicators form partnerships to develop and hold LIHTC-eligible properties, and to facilitate investment in exchange for tax credits.[24] Syndicators and investors often partner in several partnerships holding several affordable housing projects.[25] The partnerships have the purpose of acquiring, financing, developing, and managing the affordable housing.[26] The syndicator is usually the general

---

credit partnership, it will often syndicate the credits to an 'upper-tier' investor or group of investors.").

[24] *See, e.g.*, *Opa-Locka*, 2020 WL 4381624, at *3.

[25] *E.g.*, *CED Cap. Hldgs. 2000 EB, L.L.C. v. CTCW Berkshire Club, L.L.C.*, 2020 WL 6537072, at *2 (Fla. Cir. Ct. Nov. 3, 2020).

[26] *See, e.g.*, *Riseboro Cmty. P'ship Inc. v. SunAmerica Hous. Fund 682*, 482 F. Supp. 3d 31, 33 (E.D.N.Y. 2020), *as corrected* (Aug. 31, 2020) ("'[The] Partnership has been organized exclusively to acquire the Apartment Complex and to develop, rehabilitate, finance, construct, own, maintain, operate and sell or otherwise dispose of the Apartment Complex, in order to obtain long-term appreciation, cash income, [LIHTC Program tax credits,] and tax losses.' The [operative partnership] Agreement requires that the Apartment Complex be 'developed in a manner which satisfies, and shall continue to satisfy, all restrictions, including tenant income and rent restrictions applicable to projects generating [LIHTC Program tax credits].'" (quoting the operative partnership agreement)); *SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*, 2021 WL 391420, at *2 (E.D. Mich. Feb. 4, 2021) ("According to the Agreement's recitals section, the Partnership was 'formed to acquire, rehabilitate, own, maintain and operate a 150-unit apartment complex intended for rental to elderly persons of low and moderate income, known as Presbyterian Village North, and located in Pontiac, Michigan.' Section 3.01, however, entitled 'Purpose of the Partnership,' goes on to clarify that the Partnership was 'organized exclusively to acquire, finance, rehabilitate, own, maintain, operate and sell or otherwise dispose of the [Property], in order to obtain long-term appreciation, cash income, [tax credits under the LIHTC Program,] and tax losses.'" (internal citations omitted)), *appeal filed*, *SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*, No. 21-1243 (6th Cir.); *Opa-Locka*, 2020 WL 4381624, at *1 ("OLCDC joined Banc of America Community Development Corporation ('BACDC') in forming the Company for the purpose of acquiring, developing, and operating Aswan Village as affordable housing, and to finance those activities through participation in the Low Income Housing Tax Credit ('LIHTC') program . . . ."); *Senior Hous. Assistance Gp. v. AMTAX Hldgs. 260, LLC (SHAG I)*, 2019 WL 687837, at *3 (W.D. Wash. Feb. 19, 2019) ("The seven Limited Partnership Agreements have . . . two stated

partner, and it will often receive fees for its role.[27] The general partner has discretion and control over the partnership's operations, subject to certain enumerated restrictions.[28] Institutional investors seeking tax credits invest as limited partners with only a few enumerated consent rights.[29]

"Through this framework, Section 42 advances the deliberate policy choice to replace a typical equity investor's expectations of economic cash flow or appreciation from the apartment complex with a comparable or better return on investment almost solely derived from tax benefits."[30] The limited partner's receipt of tax credits is stretched over ten years (the "Credit Period") to provide a baseline

---

purposes: (1) to develop, operate, and 'otherwise deal with' the projects; and (2) to enter into operating use lease agreements with SHAG to ensure favorable treatment under federal and state tax laws."); *Homeowner's Rehab*, 99 N.E.3d at 742 ("The parties in this case are partners in a limited partnership formed for the purpose of rehabilitating and operating an affordable housing complex."); *id.* 743 ("[T]he limited partnership here was formed for the purpose of participating in the LIHTC program . . . ."); *id.* at 754 ("The purpose of the partnership, as stated in section 2.5.A of the partnership agreement, is to 'invest[] in real property and . . . provi[de] . . . low income housing.'").

[27] *See, e.g.*, *Mun. Mortg.*, 876 F. Supp. 2d at 627; *Residual Value Capture* at 529 n.155 ("The banks, syndicators, investors, and so on, all require fees or profits in order to entice their participation.").

[28] *E.g.*, *SHAG I*, 2019 WL 687837, at *3; *Pathway of Pontiac*, 2021 WL 391420, at *3; *Riseboro*, 482 F.Supp.3d at 35; *Homeowner's Rehab*, 99 N.E.3d at 746; *CED Cap. Hldgs.*, 2020 WL 6537072, at *2.

[29] *E.g.*, *SHAG I*, 2019 WL 687837, at *3–4; *Pathway of Pontiac*, 2021 WL 391420, at *3; *Opa-Locka*, 2020 WL 4381624, at *3; *Riseboro*, 482 F.Supp.3d at 35; *CED Cap. Hldgs.*, 2020 WL 6537072, at *2.

[30] *Opa-Locka*, 2020 WL 4381624, at *3 (internal quotations and emphasis omitted).

ten-year incentive to maintain the housing as affordable.[31]  To keep those tax credits from being clawed back, the partnership must adhere to LIHTC program requirements, including rental rate restrictions, for another five years (together with the Credit Period, the fifteen-year "Compliance Period").[32]  And even after the end of the Compliance Period, project owners allocated tax credits after 1989 must continue to comply with the program for an additional fifteen years, known as the "Extended Use Period."[33]  Thus, investors' bargain for ten years of tax credits results in thirty years of affordable housing.

The program is designed to keep the housing affordable even longer.[34]  At the end of the Compliance Period, the partnership can convey the property to a certified nonprofit under the terms of a right of first refusal ("ROFR") at a below-market price

---

[31] *Id.*

[32] Macari Tr. 13; *see also CED Cap. Hldgs.*, 2020 WL 6537072, at *2; *Pathway of Pontiac*, 2021 WL 391420, at *1; *Opa-Locka*, 2020 WL 4381624, at *3.

[33] *Pathway of Pontiac*, 2021 WL 391420, at *2; *Opa-Locka*, 2020 WL 4381624, at *3.

[34] *Opa-Locka*, 2020 WL 4381624, at *3 ("But the LIHTC program's aim of creating and preserving low-income housing does not end at thirty years.  Rather, the LIHTC program seeks to preserve low-income housing in perpetuity by creating a special role for nonprofits, like OLCDC, whose missions are not to profit from a sale of the low-income housing project, but to continue to develop and preserve the low-income housing in perpetuity for the betterment of the public and the community in which project is located."); *see also, e.g.*, JX021 at DLE_0001175 ("Each Building of the Project must meet the provisions of [Section 42] regulations during each of 15 consecutive years in order to remain qualified to receive the [tax] credits.  In addition, the Partnership entered into an Extended Use Agreement, which requires the utilization of the Project pursuant to Section 42 for a minimum of 35 years after the compliance period, even if the Partnership disposes of the Project.").

set by statute.[35]  The ROFR is designed to facilitate the nonprofit's preservation of the complex as continued affordable housing.[36]  This conveyance opportunity is structured as a ROFR to ensure the tax credits flow to the partnership rather than the nonprofit.[37]  It is not unusual for the purchasing nonprofit to be affiliated with a member of the partnership.[38]  The general partner may be authorized to exercise the ROFR without the limited partner's consent.[39]

B.    **The Parties' Partnership Structure Implementing The LIHTC Framework**

The Fund's structure is typical of a LIHTC partnership in most respects.  The general partner, Fund GP, is a subsidiary of a syndicator, Hudson Housing Capital LLC (the "Syndicator"); holds management rights;[40] and collects fees and a fractional percentage of the available tax credits.[41]

The great majority of the tax credits go to the investor limited partners who contribute capital to the endeavor.  As in most LIHTC limited partnerships, the

---

[35] *Opa-Locka*, 2020 WL 4381624, at *3.

[36] *Id.*; *Homeowner's Rehab*, 99 N.E.3d at 754.

[37] *Riseboro*, 482 F.Supp. at 34–35; *Homeowner's Rehab*, 99 N.E.3d 744 at 754.

[38] *E.g.*, *SHAG I*, 2019 WL 687837, at *2; *Pathway of Pontiac*, 2021 WL 391420, at *1.

[39] *E.g.*, *Pathway of Pontiac*, 2021 WL 391420, at *6 (concluding the limited partner "Plaintiff was not required to form an intent to sell the Property for Presbyterian to exercise its ROFR").

[40] *See generally* Fund LPA at Art. VI.

[41] *Id.* § 6.8D; *id.* § 5.1B; PTO ¶ 14 ("The general partner is the Fund GP, which holds a 0.01% interest in the Fund.").

Fund's limited partners hold certain enumerated consent rights. The consent rights relevant here are designed to account for the fact that the Fund has not one, but two limited partners.[42] Under the Fund's 2002 limited partnership agreement (the "Fund LPA"), the sole limited partner was First Chicago Leasing Corporation ("First Chicago"), a JPMorgan Chase affiliate.[43] In 2007, First Chicago sold part of its interest, creating DLE as a second limited partner but still staying on as a limited partner.[44] I will refer to First Chicago and its successors as "Fund LP." The Fund LPA was amended to accommodate a second limited partner: it provides DLE and Fund LP hold consent rights as one voice, as the "Investor Limited Partners."[45] Their "Consent" is defined as being given by "Investor Limited Partners holding more than fifty percent (50%) of the Percentage Interests held by all of the Investor Limited Partners."[46] DLE's Percentage Interest is 49.005%; Fund LP's is 50.995%.[47] This means Fund LP can give Consent of the Investor Limited Partners without DLE, and

---

[42] First Amendment at HUDSON00018162 (amending the Initial Fund LPA definition of "Consent" and amending the Initial Fund LPA definition of "Investor Limited Partner" to include both limited partners).

[43] Fund LPA at HUDSON00018181.

[44] *See generally* First Amendment; JX023 at DLE_0004979; Macari Tr. 16; PTO ¶ 14.

[45] First Amendment at HUDSON00018162.

[46] *Id.*

[47] *Id.* at HUDSON00018162 (amending the Initial Fund LPA definition of "Percentage Interest").

13

DLE can never, alone, give that Consent.[48] When the Fund LPA requires "Supermajority Consent," then votes reflecting more than two thirds "of the Percentage Interests held by all of the Investor Limited Partners" are necessary.[49] DLE's consent is required for Supermajority Consent.[50]

The Fund is unique from other LIHTC partnerships showcased in recent litigation in that it does not hold the affordable housing complexes itself: it has held indirect interests in up to five partnerships, each of which held or holds a property.[51] Each holding partnership was formed to own "an affordable housing property constructed, rehabilitated or acquired by a Property Partnership, which property is or is planned to be eligible for [LIHTC]."[52] The Fund owns "Intermediate Entities"

---

[48] Chiusano Tr. 389–90.

[49] First Amendment at HUDSON00018163 (adding the definition of "Supermajority Consent" to the Initial Fund LPA); *id.* at HUDSON00018167–69 (amending the Initial Fund LPA Section 6.3 to add Section 6.3B); Fund LPA § 6.3B(viii).

[50] Fund LPA § 12.2 ("A Limited Partner shall be entitled to cast one vote for each Unit owned by such Limited Partner . . . ."); PTO ¶ 14 ("The current limited partners are DLE, which holds a 49.0000995% interest in the Fund, and [Fund LP], which holds a 50.9899005% interest in the Fund.").

[51] In December 2007, the Fund was the sole member of five limited liability companies that each held a 99.98% limited partnership interest in a corresponding property partnership. First Amendment at HUDSON00018158. As of December 2017, the Fund held indirect interests in three of those five property partnerships. Macari Tr. 20. By August 2020, only two LLC-property partnership pairings remained in the Fund's portfolio—Kate's Trace LLC (Kate's Trace Limited Partnership) and Hudson Country Meadow LLC (Country Meadow Residences, L.C.). *Id.* 50.

[52] Fund LPA at Art. I (defining "Approved Property Partnership," "Property," "Property Partnership," and "Property Partnership Interests").

14

that are limited partners in each holding partnership.[53]   When DLE entered the

partnership in 2007, the Fund owned interests in five Intermediate Entities that each

held a 99.98% limited partnership interest in a corresponding property partnership.[54]

This case centers on the Fund's investment in a LIHTC-eligible 108-unit

housing complex known as Kate's Trace Apartments in Newport News, Virginia

(the "Property").[55]  The Property is held by Kate's Trace Limited Partnership (the

"Property Partnership"), a Virginia partnership.[56]  The Fund invests in the Property

Partnership via Hudson Kate's Trace LLC (the "Intermediate Entity" or "Property

LP"), which is the limited partner in the Property Partnership.[57]

The Fund and the Property Partnership, linked by the Fund's ownership of

Property LP, implemented the LIHTC model by facilitating the flow of capital from

the Fund's investors to the Property, and the flow of tax credits back up to the Fund's

investors.  Property LP conveyed Fund capital to the Property Partnership, which

used the funds to build, operate, and maintain the Property.[58]  In exchange for

developing and maintaining an affordable housing project, the Virginia state

---

[53] *Id.* (defining "Intermediate Entity"); First Amendment at HUDSON00018158.

[54] First Amendment at HUDSON00018158.

[55] PTO ¶ 13; Property LPA at HUDSON00018376.  Elsewhere in the record, the Property is referenced as having 104 units.  *See, e.g.*, JX168 at HUDSON00008086.

[56] PTO ¶ 32.

[57] *Id.* ¶ 35.

[58] *Id.* ¶ 39.

15

government allocated a predetermined schedule of tax credits to the Property Partnership.[59]

The partners repeatedly created forecasts reflecting this exchange. Fund LPA Section 3.3A(ii) requires that when an investor makes a capital contribution, the investor and the general partner must "execute and confirm a financial forecast describing the economic and tax benefits that are projected to be generated by the Fund with respect to its investment (directly or indirectly through an Intermediate Entity) in the Property Partnership to which such Subscription Agreement relates for the benefit of the Partners."[60] A set of 2004 projections forecasted $5,910,636 in tax credits from the Property from 2005 through 2015.[61] In 2007, when DLE entered

---

[59] *See* Property LPA at Art. II (defining "Agency" and "Projected Credit"); JX004 at HUDSON00018773.

DLE objected to my consideration of JX004 under Delaware Rules of Evidence 401, 402, 403, 602 and 901. D.I. 169 at 1; Trial Tr. 25–27. Rules 401, 402, and 403 relate to whether evidence is relevant. Evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; [] (b) the fact is of consequence in determining the action"; and (c) "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, . . . undue delay, wasting time, or needlessly presenting cumulative evidence." D.R.E. 401; D.R.E. 403. I conclude JX004 is admissible under Rules 401, 402, and 403 because it is relevant to the expectations of the original parties to the Fund LPA, and its probative value is not outweighed by any of the factors listed in Rule 403. JX004 is admissible under Rule 602 because Joseph Macari "has personal knowledge" about JX004, as a signatory thereto and original party to the Fund LPA. D.R.E. 602; Macari Tr. 25. JX004 is also admissible under Rule 901 because it was introduced by a witness with personal knowledge. D.R.E. 901(b)(1); Macari Tr. 25. DLE's objection is overruled.

[60] Fund LPA § 3.3A(ii).

[61] JX004 at HUDSON00018773; Macari Tr. 29.

16

the partnership, the Fund LPA compelled the creation of another forecast for each property partnership.[62] The price DLE paid for its interest was based off of its projected tax benefits through 2020.[63] The projections created upon DLE's entry to the partnership forecasted $2,275,559 in tax credits from the Property from 2008 through 2015, tax benefits through 2020, and no cash flows or positive income.[64] And the Property LPA enumerated the projected credits applicable to the Property through 2015.[65] The forecasted 2019 or 2020 end to the tax benefits aligned with

---

[62] Fund LPA § 3.3A(ii).

[63] Trane Tr. 521–22.

[64] JX011 at DLE_0005420; Trane Tr. 520–22 (confirming the JX011 projections were attached to the Fund LPA when DLE acquired its interests and what they projected); Macari Tr. 31 ("Q: Was the Fund limited partner projected to receive any cash flow from the Kate's Trace investment? A: No. Q: Was the Fund limited partner projected to receive any appreciation or equity in the investment? A: No."); *id.* 40 ("So, basically, no cash flow would be forecasted to be paid over this period."); *id.* 43 ("Q: So is it correct that you projected that the Fund would receive no cash flow through at least 2029 from Kate's Trace? A: That is correct."); *id.* 87 ("We have received the tax credits. We have received tax losses. We were unlikely to receive any future tax losses or cash flow."); *id.* 104 ("Q: And over the term of Kate's Trace partnership, is it your testimony that no cash flow has been received by the partners? A: There's no cash flow been received by the limited partner.").

[65] Property LPA at Art. II (defining "Projected Credit" and stating the final year of Projected Credits will be 2015); *id.* § 4.01(q).

17

the end of the Compliance Period and the predicted exercise of the ROFR.[66] DLE's

internal projections also modeled the ROFR and a disposition in 2020 or 2021.[67]

The Property Partnership distributed the tax credits, doling out 99.98% to

Property LP.[68] Property LP conveyed those tax credits to the Fund, and the Fund

distributed them to its partners commensurate with their interest; the limited

partner(s) received over 99% of the remaining tax credits, and Fund GP received

0.01% of the tax credits.[69] By the end of the Credit Period in 2015, DLE and Fund

LP received "materially all" the Property's projected tax credits.[70]

---

[66] Macari Tr. 32 ("Again, it's industry practice to do these forecasts to terminate at the end of the compliance period. And the expectation when this investment was made was that 2019 would be the last year of the compliance period."); PTO ¶ 40 ("The Compliance Period for the final building in the Apartment Complex ended on December 31, 2020."); JX004 at HUDSON00018773; JX011 at DLE_0005420; JX014 at DLE_0007799.

[67] JX014 at DLE_0007799 (expressing an expectation in 2016 that "all of [Hudson's] properties [will be] sold in 2020"); JX014 at DLE_0007800–01 ("Also, please provide [a] schedule that shows the amount of liabilities the fund will accrue from 2017 to the year in which the final property is expected to be disposed of, I think this is around 2020 or 2021."); JX015 ("Last year of compliance period: . . . Kates Trace 2020"); JX058 at DLE_0002308 ("Lower Tier non-profit GP has a non-profit ROFR beginning in 2020 at the minimum purchase price."); JX037 at DLE_0004085 ("GP has a ROFR that results in no value to LP"); JX089 at DLE_0001819 ("If GP exercised ROFR, purchase price would be ~$0 given LP tax capital is ~$0."); Chiusano Tr. 390, 392–94; 400–01, 405–06, 410–11 (explaining how the ROFR discounted DLE's internal valuation of the Property Partnership Interests).

[68] Property LPA § 5.01(b)(ii).

[69] PTO ¶¶ 9, 14; Fund LPA § 5.1B.

[70] PTO ¶ 41; Trane Tr. 522; Macari Tr. 33, 87.

18

The Property Partnership has other stakeholders alongside the Fund. The Property Partnership's general partner is Kate's Trace Housing Corporation ("Property GP").[71] Property GP is a subsidiary of AHC, Inc. (the "Developer"), an affordable housing developer.[72] The Syndicator is represented at the Property Partnership level through its subsidiary, JER Hudson SLP LLC ("Property SLP"), which is the Property Partnership's special limited partner.[73] The Fund limited partners do not have direct representation in the Property Partnership.

The organizational structure of the Fund and the Property Partnership is reflected in the diagram below:

---

[71] PTO ¶ 34.

[72] *Id.*; Property LPA at Art. II (defining "Developer").

[73] PTO ¶¶ 33, 36.



The Property Partnership's limited partnership agreement (the "Property LPA") mandates that Property GP maintain the Property and the Property Partnership in accordance with the LIHTC program.[74] And it implements the program's feature of a ROFR to a designated affordable housing nonprofit. Five years after the Property's allocated tax credits are exhausted, *i.e.* after the fifteen-year Compliance Period, the Property LPA grants Property GP "the right to

---

[74] *See, e.g.*, Property LPA §§ 3.02(i), 4.01(p)–(q), (z), 4.02(j).

designate a 'qualified non-profit organization'" to have a ROFR "for the minimum price established in accordance with Section 42(i)(7) of the Code, plus" outstanding debt and taxes attributable to the sale.[75] After a post-Compliance Period offer to purchase the Property, the designated nonprofit may exercise its ROFR and purchase the Property for the statutory below-market price.

## C. Post-Compliance Period Investors Pursue Higher Returns.

At the end of the Credit Period, the investor has reaped all the tax credits it can from its investment and typically exits the partnership by selling its limited partner interests, either to the general partner or to a third party.[76] The value of those interests is much lower than it was at the beginning of the Credit Period, as the tax credits have been harvested. Purchasers of these cheaper limited partner interests were typically not involved in the partnership when it was created, when it purchased the affordable housing project, or when it distributed the tax credits.[77]

---

[75] PTO ¶ 11; Property LPA § 8.02(e) (citing 26 U.S.C. § 42(i)(7)).

[76] *See SHAG I*, 2019 WL 687837, at *1; *Opa-Locka*, 2020 WL 4381624, at *2; *Homeowner's Rehab*, 99 N.E.3d at 744–45.

[77] *CED Cap. Hldgs.*, 2020 WL 6537072, at *2–3; *see also* Brandon M. Weiss, *Clarifying Nonprofit Purchase Rights in Affordable Housing*, 48 FORDHAM URB. L. J. 1159, 1168 (2021) [hereinafter "*Clarifying Nonprofit Purchase Rights*"] ("Over the last several years, however, a new trend in the field has emerged, leading to burgeoning disputes around the country. As a growing number of LIHTC developments have reached the end of their initial compliance period, various financial entities began to see an opportunity at this critical moment in the life of the project to extract value.").

Entry of a certain type of new limited partner after the Credit Period has proven to introduce tension between that new limited partner and the general partner. There is "a trend in the LIHTC industry in which certain entities, like Hunt [Capital Partners], are acquiring limited partner interests in LIHTC partnerships—known as 'Aggregators'—who then attempt to extract value out of such interests that were not intended by the original parties to the partnerships."[78]

---

[78] *CED Cap. Hldgs.*, 2020 WL 6537072, at *5; *accord id.* at *10 ("[P]arties, like Hunt, have come into LIHTC partnership agreements and attempted to extract value or proceeds that is not otherwise permitted under the operative contracts like the Partnership Agreement here." (collecting cases)); *id.* at *6 (referring to a financial benefit to Hunt that was not otherwise intended by the original tax credit investor); *id.* at *6 (describing the aggregator's "bad faith financial motivations"); *id.* at *5 ("CTCW's actions in refusing to exit the Partnership and refusing to consent to a refinance of the Permanent Loan, as explained above in connection with its *efforts to extract a larger than negotiated residual value upon its exit from the Partnership, were in direct conflict with the original tax credit investor's financial expectations and entitlements*." (emphasis added)); *Opa-Locka*, 2020 WL 4381624, at *2 ("Defendants recognize that, because of the ROFR, they have 'no real equity' in the Company and Aswan Village and have 'no value except through operating cash flow.' Accordingly, when Defendants consummated the aforementioned transaction to acquire [Bank of America]'s position in the Company, they paid no more than $400,000 because OLCDC's ROFR preserved all of Aswan Village's equity for OLCDC, *which is precisely its intent of the ROFR and consistent with the policy goals and objectives of Section 42 and LIHTC program in general*." (emphasis added)); *Full Circle Villagebrook GP, LLC v. Protech 2004-D, LLC*, 2021 WL 4061744, at *1 (N.D. Ill. Sept. 7, 2021) (describing aggregators as entities that "acquire[] interests in LIHTC affordable housing partnerships and upon the conclusion of the 15-year compliance period required by Section 42 (the 'Compliance Period'), challenge[] the contractual transfer rights associated with those partnerships"); *Clarifying Nonprofit Purchase Rights* at 1168 ("But in an increasing number of cases, new investors, sometimes referred to as 'aggregators,' buy out original investor limited partner interests in nonprofit-developed LIHTC partnerships with projects approaching year 15." (citing David A. Davenport, *Year 15: Facing off with the*

Over the last several years, [] a new trend in the field has emerged, leading to burgeoning disputes around the country. As a growing number of LIHTC developments have reached the end of their initial compliance period, various financial entities began to see an opportunity at this critical moment in the life of the project to extract value. Investors in these disputes use a variety of tactics to pressure nonprofits—for example, refusing to consent to applications for financing to conduct necessary capital improvements. . . . Other efforts focus on removing the nonprofit general partner from the partnership, for example, via claims of breach of fiduciary duties. With control of the project, an investor can attempt to eliminate the extended rent and income restrictions on the property through a technical procedure known as the "qualified contract" process. Alternatively, investors can simply wait until the extended use restrictions expire and convert the property to market-rate use or sell to a third party that sees long-term upside value. In all cases where a nonprofit holds a Section 42 ROFR, these various investor efforts can only succeed if the nonprofit cannot successfully acquire the property pursuant to the ROFR.[79]

When the general partner does not accede to the new limited partner's demands, the limited partner and general partner clash over the general partner's fiduciary duties and the terms of the governing partnership agreement, and litigation follows.[80] In some instances, new limited partners have sought to leverage

---

*Aggregator—Newcomers Try to Toss Partnership Intent Out the Window*, TAX CREDIT ADVISOR, 27 (May 2019))).

[79] *Clarifying Nonprofit Purchase Rights* at 1168–69 (citations omitted).

[80] *Id.* at 1169; *Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing*, WASH. STATE HOUS. FIN. COMM'N 5 (Sept. 2019), https://www.wshfc.org/admin/Reporton15YearTransferDisputes.pdf ("In recent years, . . . . some private firms have begun to systematically challenge nonprofits' project-transfer rights and disrupt the normal exit process in hopes of selling the property at market value. . . . [These firms], dubbed 'aggregators,' often use burdensome tactics that take advantage of legal ambiguities, resource disparities, and economies of scale to overwhelm their nonprofit counterparties.").

partnership liabilities in order to secure a profitable buyout and cash return.[81] In

other instances, that tension has come to a head over the property's disposition

through the ROFR.[82] New limited partners have attacked the exercise of the ROFR

based on the legitimacy of the triggering offer, whether the partnership was a willing

seller, and other mechanical issues.[83] The plaintiffs in those cases have also asserted

a general partner breached its fiduciary duties by permitting the exercise of a ROFR

---

[81] *E.g.*, *CED Cap. Hldgs.*, 2020 WL 6537072, at *5 ("CTCW's actions in refusing to exit the Partnership and refusing to consent to a refinance of the Permanent Loan were orchestrated by Hunt and were designed to drive a cash return, ultimately to Hunt, that was never intended by the original tax credit investor or anyone originally involved in the Project."); *Opa-Locka*, 2020 WL 4381624, at *5.

[82] *E.g.*, *Opa-Locka*, 2020 WL 4381624, at *5.

[83] *E.g.*, *Centerline Hous. P'ship I, L.P.-Series 2 v. Palm Cmtys. (Centerline I)*, 2021 WL 2493255, at *2, *4 (C.D. Cal. Apr. 26, 2021) (ruling on a case where an alleged "aggregator," Alden Torch Financial, LLC, opposed the exercise of a ROFR on the "belief that the Offer was not bona fide, and therefore that the right of first refusal was not triggered either"); *Pathway of Pontiac*, 2021 WL 391420 (challenging the nonprofit's exercise of its ROFR because the triggering offer was solicited and purportedly not a "bona fide offer"), *appeal filed*, *SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*, No. 21-1243 (6th Cir.); *Riseboro*, 482 F. Supp. 3d 31 (challenging the nonprofit's potential exercise of a ROFR for lack of a willing seller and a third-party bona fide offer); *Opa-Locka*, 2020 WL 4381624, at *12 (finding for the nonprofit plaintiff where defendant challenged plaintiff's "ability to exercise the ROFR it bargained for" because, according to defendant, the ROFR "would confer an unjust windfall on" the nonprofit); *Homeowner's Rehab*, 99 N.E.3d at 758 (rejecting the limited partners' contention that the ROFR can only be triggered by a "bona fide third-party offer" as the common law requires, because "such a limitation would be inconsistent with the statutory scheme of § 42 and with the specific terms of the agreements"); *SHAG I*, 2019 WL 1417299, at *1, *7 (deciding a case where defendant challenged plaintiff's ROFR exercise for an alleged lack of a "bona fide and enforceable offer").

or otherwise thwarting the goals of a new limited partner.[84]  This matter is one of several such cases.[85]  DLE's counsel and witnesses here appear in many of those cases.[86]

By 2015, the Property's Credit Period had ended and the Investor Limited Partners had captured all of the Property's tax credits.[87]  Thereafter, between 2015 and 2020, the Fund's original investors exited DLE, and Hunt Capital Partners

---

[84] *E.g.*, *Centerline Hous. P'ship v. Palm Cmtys. (Centerline II)*, 2022 WL 247951, at \*7–8 (C.D. Cal. Jan. 12, 2022) (alleging the general partner's trigger and exercise of the ROFR breached its fiduciary duties to the limited partners), *appeal filed Centerline Hous. P'ship I, L.P.-Series 2 v. Palm Cmtys.*, No. 22-55367 (9th Cir.); *SHAG I*, 2019 WL 687837, at \*8 (denying the limited partner's motion for summary judgment on defendant's breach of fiduciary duty counterclaim against the nonprofit plaintiff and general partners for the nonprofit's attempt to exercise its ROFR for failure demonstrate breach or injury).

[85] *CED Cap. Hldgs.*, 2020 WL 6537072, at \*10 (collecting cases).

[86] *E.g.*, *id.* at \*3 (considering a suit brought by a limited partner controlled by Hunt Capital Partners, and noting, "Mr. Kagey is Hunt's Chief Financial Officer and he provided testimony at the aforementioned bench trial, testimony that was evasive and often by the Court to be not credible" with respect to Kagey's testimony about a purported purchase price "analysis" used in an attempt to "achieve a higher purchase price under the Purchase Option"); *Senior Hous. Assistance Gp. v. AMTAX Hldgs. 260, LLC (SHAG II)*, 2019 WL 1417299, at \*1 (W.D. Wash. Mar. 29, 2019) (finding Ryan Trane "generally credible" where the limited partner challenged the general partner's ROFR exercise for LIHTC properties).  Kagey and Trane testified in this matter.  Kagey Tr. 468–98; Trane Tr. 498–555.  DLE's forwarding counsel here represents limited partner defendants or appellants in *SunAmerica Housing Fund 1050 v. Pathway of Pontiac, Inc.*, 2021 WL 391420 (E.D. Mich. Feb. 4, 2021), (currently on appeal before the United States Court of Appeals for the Sixth Circuit, No. 21-1243 (6th Cir.)), *AMTAX Holdings 227, LLC v. Tenants' Development II Corp.*, 15 F.4th 551 (1st Cir. 2021), and *Riseboro Community Partnership Inc. v. SunAmerica Housing Fund 682*, 482 F.Supp.3d 31 (E.D.N.Y. 2020).

[87] PTO ¶ 41; Trane Tr. 522; Macari Tr. 13, 33, 87.

25

("Hunt") purchased DLE's interest and the right to manage DLE.[88] When Hunt became DLE's owner and manager, it stepped into the expectation that material tax benefits from the Property would end, and the ROFR would be exercised around the end of the Compliance Period. Indeed, the Compliance Period ended December 31, 2020, and DLE received all of its projected tax benefits from the Property.[89] By then, the Fund retained an interest in only two of the original five Intermediate Entities—Property LP and Hudson Country Meadow LLC, which held Property Partnership Interests in Country Meadow Residences, L.C.[90]

But DLE seeks more, and has made its desires known at various touchpoints. In late 2017, First Chicago sought to liquidate its stake in Fund LP before the

---

[88] At the end of 2015, DLE was sold to a fund in which Bank of America, Merrill Lynch ("BOA") was the sole investor and MMA Capital Management was the managing member ("TC Fund I"). JX023 at DLE_0005055; Macari Tr. 16; Chiusano Tr. 388–89; Kagey Tr. 483–84. In late 2017, Hunt Companies acquired MMA Capital Management's entire LIHTC management portfolio and became managing agent of DLE. Chiusano Tr. 388–89. About a year later, Hunt Companies transferred that responsibility to its affiliate, Hunt. Chiusano Tr. 388. In 2020, one or more Hunt affiliates purchased BOA's entire interest in DLE. Kagey Tr. 483–84; Trane Tr. 522–23. They were obligated to do so, including DLE, pursuant to a "fair market value put." Kagey Tr. 484; Trane Tr. 522–23.

[89] PTO ¶¶ 40–41; Trane Tr. 522; JX015 ("Last year of compliance period: . . . Kates Trace 2020"); Macari Tr. 32.

[90] Compare Macari Tr. 50, with First Amendment at HUDSON00018158. Between December 2007 and December 2017, the Fund sold or disposed of its interest in Hudson Channel Island LLC (Steadfast Channel Island, L.P.) and Hudson/Overton LLC (Overton Square, L.P.). Compare Macari Tr. 20, and JX030 at HUDSON00005166, with First Amendment at HUDSON00018158. Between December 2017 and August 2020, the Fund sold or disposed of its interest in Hudson/Tidwell LLC (Fountains at Tidwell, Ltd.). Macari Tr. 20.

Compliance Period ended in December 2019.[91]  DLE's consent was required under the Fund LPA, and Hunt was at DLE's helm.[92]  Fund GP explained the availability of the ROFR meant First Chicago's partnership interest had "no economic value."[93]  At the time, DLE's asset manager contended that despite the ROFR, "there [wa]s the possibility that some value could flow to the Fund upon a disposition event," because, he claimed, a designated nonprofit might be unable or unwilling to exercise the ROFR.[94]  At trial, DLE's asset manager conceded that in almost a decade in the LIHTC industry, he has never seen that happen.[95]  Eventually, in December 2017, a subsidiary of the Syndicator, called HHC Investments LLC purchased First Chicago's interest in Fund LP.[96]

As the end of the Property's Compliance Period grew near, DLE began agitating for a way to avoid the ROFR and force either a sale of the Property or a

---

[91]  JX025 at HUDSON00000467; JX026 at HUDSON00000474; JX030 at HUDSON00005166; Macari Tr. 30–32 (explaining the projected end of the Compliance Period was December 31, 2019).

[92]  Fund LPA § 6.3A(xiii); First Amendment at HUDSON00018163 (defining "Supermajority Consent"); JX026 at HUDSON00000474 ("The sale of [First Chicago]'s interest requires the consent of [DLE] as the Fund owns other investments.").

[93] JX025 at HUDSON00000467.

[94] JX028 at DLE_0000507.

[95] Chiusano Tr. 394–98 (testifying that he had no experience with a "property being sold for fair market value, despite the Section 42 ROFR" from what he could "recall").  This refreshing moment of candor stood out in Chiusano's testimony.

[96] *See* Macari Tr. 20; JX031 at DLE_0005509; PTO ¶ 14.  Whether DLE consented to First Chicago's sale is not part of the record and not part of the dispute before this Court.

Developer buyout of DLE's stake at "fair market value."[97] Over the course of 2019 and 2020, the Developer made three offers to purchase the Fund's interest in the Property Partnership.[98] Fund GP brought all three offers to DLE.[99] Fund GP repeatedly advised that the ROFR meant the Fund was unlikely to see any value from the Property, and so DLE's interest was of minimal value.[100] The third offer

---

[97] *See, e.g.*, JX062 at DLE_0002407 ("Year 16 – Force Sale Rights / Execution of the Qualified Contract provision. . . . An ideal, but highly unlikely, outcome would be to stay in the deal until year 16 hoping that the SLP forces a Compliance Termination Sale. The property is comprised of 108 units in Newport News, VA. Theoretically, there could be value in a [qualified contract] sale, but getting that outcome given the [ROFR] rights in the near terms seems unlikely."); JX075 at DLE_0002601 (describing a process by which "Hudson [could] exercise its rights and be able to sell the property at the fair market value"); JX096 ("I think that $500k for our interest is reasonable based on the attached given the ROFR on [the Property], which implies $350k for the [Property] interest. A realistic full FMV LP value for [the Property] is about $2M. An alternative approach would be to go out at about $800k for [DLE's] fund LP interest, which would imply about $1M for the [Property] interest (midpoint of full FMV LP value). My gut tells me to start at the $800k. [Macari] is going to balk at it regardless.").

[98] Macari Tr. 33–34; JX042 at DLE_0002254 ("We have received an inquiry from the sponsor of [the Property] about purchasing the Fund's interests in [the Property]."); JX052 at HUDSON00000262 ("I am proposing to acquire all of Hudson's partnership interests . . . ."); JX090 at HUDSON00016317 ("The sponsor has asked about purchasing the Fund's interests for a price of about $71,000."); JX135 at HUDSON00017092 (describing the repeated buyout offers); JX142 ("After careful consideration, [the Developer] ha[s] offered to purchase the limited partnership interests for $200,000.").

[99] Macari Tr. 33–38.

[100] JX042 at DLE_0002254 ("[T]he sponsor has a ROFR; hence, Fund XXI unlikely to see any economic value . . . ."); JX053 ("The sponsor has reached out again regarding the notion of buying back the interests. Given the ROFR and a positive capital account, in theory they could be entitled to repurchase for -0-."); JX078 at HUDSON00016266 ("Note: the sponsor has a ROFR which would result in zero proceeds with the purchase of the property." (emphasis omitted)); JX090 at HUDSON00016317 ("The Fund's capital account is -0- . . . . Hence, any exercise of the ROFR would result in a sale of the asset for -0- . . . .").

would have bypassed the Fund LPA's disposition waterfall and fee structure, and allocating 100% of the proceeds to DLE even though it owned fewer than 50% of the Fund's interests.[101] In other words, that buyout would have paid only DLE and not Fund GP or Fund LP.

DLE rebuffed each of the Developer's buyout offers as too low.[102] Again, DLE's asset manager represented that DLE or Hunt had been involved with other projects where a fund received value despite similar ROFR language; again, at trial, he admitted he has never actually seen a fair market value sale despite a Section 42 ROFR.[103] As to the third offer in particular, DLE responded to Fund GP with a broker opinion of value (the "BOV") from "September 2020 that shows a midpoint

---

[101] JX142 ("After careful consideration, [the Developer] ha[s] offered to purchase the limited partnership interests for $200,000. As you know, you would ordinarily be entitled to only a portion of this amount per the upper tier waterfall (i.e., [DLE's] ownership is less than 50%, a Disposition Fee would be due, etc.). I've attached, a spreadsheet that estimates the amount that might ordinarily be distributed: $1,716."); Macari Tr. 36–38; Fund LPA § 6.8E.

[102] JX053 ("[I]t will be difficult for us to prioritize this transaction this year if we are not receiving any economic benefit."); JX100 at DLE_0004113 (countering the Developer's second offer with a buyout proposal for $800,000); JX147 (declining the Developer's third offer as undervaluing the property); JX152 ("[H]ad a call and [DLE] did not find [the Developer's] offer acceptable, nor were they willing to counter.").

[103] *Compare* JX044 ("We discussed this deal back in December 2017 (see attached email) and were not able to approve the transaction (which allocated essentially no value to the Fund interest) given that we have been involved with transactions with similar ROFR language in the past in which the Fund received some value upon a disposition event."), *with* Chiusano Tr. 394–98.

29

property value of $9.65M ($89k/unit). This property value results in approximately $2.0M to [DLE] (and additional proceeds if the high value is achieved)."[104]

In 2020, Property GP sought Property SLP's consent to refinance.[105] Investor Limited Partner Consent was needed to support Property SLP's consent, and Fund GP (which is, as a reminder, under the Syndicator's common ownership with Property SLP) conveyed Property GP's proposal to DLE.[106] DLE rejected Property GP's refinancing proposal and instead proposed the Syndicator purchase DLE's Fund interests for $787,000.[107] This figure purportedly represented DLE's share under the Fund's waterfall based on DLE's estimated property values of the Property and the other remaining Fund investment, Country Meadow.[108] When the

---

[104] JX147; JX146 at DLE_0002038; JX150; JX027.

[105] JX086 at HUDSON00016323; JX135 at HUDSON00017092.

[106] Fund LP's consent alone would have sufficed. Property LPA § 8.02(b)(vi) ("The [Property GP] shall not, without the Consent of the Special Limited Partner, have any authority to: . . . (vi) following Final Closing, refinance the Mortgage Loan"); *id.* at Art. II (defining "Final Closing" and "Mortgage Loan"); Fund LPA §§ 6.3B(x), 6.9A, 12.2; First Amendment at HUDSON00018162; First Amendment at HUDSON00018167–69 (adding 6.3B to the Initial Fund LPA); *see also supra* note 49 and accompanying text.

[107] JX108 at DLE_0004126 ("Hudson has no interest in buying us out for $787k and they don't want to counter. . . . There is no incentive for us to approve [the refinance]."); *id.* at DLE_0004126 ("Agree no reason to approve the refi unless they want to use the proceeds to buy us out.").

DLE objected to the admissibility of JX108 in a footnote in its post-trial answering brief. D.I. 188 at 31 n.10. DLE failed to object to JX108 on the Joint Exhibit List. D.I. 169 at 6. DLE's objection to JX108 is waived. D.I. 163 at 39; Trial Tr. 89.

[108] JX104 at HUDSON00013378 ("**Hudson XXVIII:** Acacia Meadows – No proceeds to LP[.] **Hudson XXI:** Kate's Trace – Estimated Property value of $7.4M applied to the waterfall results in $2.0M+ to the ILP[.] Country Meadow[] – Greystone BOV of $7.38M

30

Syndicator declined, DLE stated there was "no reason to approve the refi unless they want to use the proceeds to buy us out."[109] The Developer accused DLE of "using [Property SLP's] consent right to alter other terms and conditions of the Partnership Agreement and demand financial benefits they are not due."[110]

DLE's course of conduct from 2019 through 2021—around the end of the Compliance Period—resembles the actions taken by other post-Credit Period limited partners in LIHTC projects.[111]

### D. The Disposition

With the Compliance Period complete, the Property could be transferred to a nonprofit through the ROFR. In November 2020, Property GP endeavored to solicit a purchase offer from a nonprofit, NHT Communities ("NHT"), with the aim of triggering the statutory ROFR.[112] This plan was executed in spring 2021.[113]

---

applied to the waterfall results in about $750k to the ILP. ***Fund XXI Waterfall:*** *Kate's Trace: $1M (discount to FMV)[;] Country Meadow[]: $750k[;] Assets less liabilities (including dispo fees): ($110k)[;] Total Cash Available: $1.64M[.] 97% to LP: $1.59M[.]* ***49.49% to TC Fund I: $787k*** "(formatting altered)). The Country Meadow compliance period ended in 2019. JX015.

[109] JX108 at DLE_0004126.

[110] JX135 at HUDSON00017094–95.

[111] *See supra* notes 79–85, and accompanying text.

[112] White Tr. 427–28. Such solicited offers appear to be part of the LIHTC playbook for partnership general partners and nonprofits, and whether they can validly trigger the ROFRS is a question underlying many post-Credit Period investors' claims challenging the exercise of the ROFRs. *See, e.g.*, *Pathway of Pontiac*, 2021 WL 391420; *Homeowner's Rehab*, 99 N.E.3d 744.

[113] JX168 at HUDSON00008101–02.

On April 7, Property GP designated Lee Gardens Housing Corporation ("Lee Gardens") as the ROFR designee (the "Designated Nonprofit") under Property LPA Section 8.02(e).[114] Lee Gardens is a subsidiary of the Developer, and therefore an affiliate of Property GP.[115] Property GP and the Designated Nonprofit entered into a ROFR agreement dated April 7 (the "ROFR Agreement").[116] By letter dated April 8, NHT offered to purchase the Property.[117] Property GP informed the Designated Nonprofit of NHT's offer in a letter dated April 9.[118] In a separate letter dated April 9, the Designated Nonprofit notified Property GP and NHT of its intent to exercise its ROFR and purchase the Property.[119] Property GP was willing to sell the Property.[120]

Property GP conveyed the Property to the Designated Nonprofit by a deed that was dated April 9, but signed April 7 (the "Disposition").[121] The Designated

---

[114] *Id.* at HUDSON00008086–87.

[115] PTO ¶ 34; Macari Tr. 12, 90–91.

[116] JX168 at HUDSON00008089–95.

[117] *Id.* at HUDSON00008101–02.

[118] *Id.* at HUDSON00008099.

[119] *Id.* at HUDSON00008103.

[120] *Id.* at HUDSON00008086; Webdale Tr. 439–40.

[121] *Compare* JX215 at HUDSON00018762 ("This DEED is made as of the 9th day of April, 2021 . . . ."), *with id.* at HUDSON00018765 ("GIVEN under my hand and seal on April 7, 2021.").

Nonprofit paid the statutorily predetermined purchase price of $4,197,015.09.[122]

Property GP did not seek consent from Fund GP, Fund LP, Property LP, or Property SLP in connection with the Disposition.[123]

At the close of business on Friday, April 9, Property GP's counsel emailed Fund GP attaching a notice (the "Disposition Notice") that Property GP had transferred the Property to the Designated Nonprofit that day.[124]  This surprised Fund GP.[125]

### E. Fund GP Investigates The Disposition And Seeks Advice From Counsel.

In response to the Disposition Notice, on or about April 12, Fund GP retained Holland & Knight LLP, which Fund GP considered "expert in the low-income housing tax credit business."[126]  Fund GP gave Holland & Knight the Disposition Notice, its internal notes regarding the Disposition Notice, and the Property LPA.[127]

---

[122] JX168 at HUDSON000008096; Property LPA § 8.02(c) (describing the "Purchase Price") (citing 26 U.S.C. § 42(i)(7)); JX168 at HUDSON000008089 (defining "Refusal Right Purchase Price" as debt plus taxes); *id.* at HUDSON000008096 (showing a chart of components that make up the purchase price);  Hickey Tr. 236 ("[T]he purchase price was actually a little bit higher than the minimum purchase price required under Section 42(i)(7), because the purchase price required, in addition, amounts owed to the limited partners at that time.  So it was in addition to the minimum that the code requires.").

[123] Macari Tr. 85–86, 150; PTO ¶¶ 52–54.

[124] JX168.

[125] Macari Tr. 56–57, 137.

[126] JX181; Macari Tr. 60–61.

[127] Macari Tr. 63–64; JX177.

It asked Holland & Knight to review the Property LPA, "in particular, language around right of first refusal," to determine whether the Developer's affiliates were "entitled to do what they did, and if not, . . . to advise [Fund GP] as to what steps [it] should or should not take."[128]

Holland & Knight completed a memorandum dated April 20 with its advice to the Fund (the "Holland & Knight Memorandum").[129] Fund GP forwarded the Holland & Knight Memorandum to DLE.[130] Based on its interpretation of the Property LPA, Holland & Knight concluded: (i) "it appears that [Property GP] acted within the scope of authority granted to it under the [Property LPA] by designating [the Designated Nonprofit] as having a right of first refusal and subsequently causing the [Property] Partnership to enter into the ROFR [Agreement] with [the Designated Nonprofit[;]" (ii) though "[o]ne could argue that having received the NHT Offer, [Property GP] had no authority" to dispose of the Property without Property SLP's

---

[128] Macari Tr. 59–60 ("[W]e wanted [Holland & Knight] to review the [Property] partnership agreement, in particular, language around right of first refusal. Again, the initial thoughts were, was [the Developer] entitled to do what they did, and if not, you know, to advise us as to what steps we should or should not take."); *id.* 60 ("I wanted to make sure [Holland & Knight] parsed through the [Property LPA] very, very carefully so that we had a thorough understanding of what had happened, was [the Developer] entitled to do what they did, and what steps we should take going forward."); *id.* 63 ("I wanted [Holland & Knight] to, you know, look at everything they thought they should look at and consider to give us some advice, but, specifically, to examine, was [the Developer] entitled to do what they did.").

[129] Holland & Knight Memorandum; PTO ¶ 58.

[130] PTO ¶ 58.

Consent "as described in Section 8.02(b)(i) . . . . this interpretation would, as a practical matter, render Section 8.02(e) of the [Property LPA] virtually meaningless[;]" and (iii) while "an argument exists that Consent of the Special Limited Partner should have been obtained prior to the disposition," "it appears unlikely that a court would conclude that the intent of the parties was to subject the consummation of a sale pursuant to the ROFR to the Consent of the Special Limited Partner."[131] It went on to state even if a court were to accept the counterargument, "it is difficult to see how the [Property Partnership] limited partners were damaged."[132] Holland & Knight ultimately advised, "[b]ased on our review of the information provided, we do not recommend challenging the authority of [Property GP] to consummate the transfer of the [Property]."[133] The Fund only had approximately $200,000 in cash reserves.[134] Fund GP "fundamentally agreed with [Holland & Knight's] advice that [its] ability to recover damages or any value was minimal. So, you know, why spend $200,000? And in addition to the $200,000

---

[131] Holland & Knight Memorandum at HUDSON00000230.

[132] *Id.*

[133] *Id.*

[134] Macari Tr. 71 ("The Fund's resources at the time I think were about net $200,000. . . . The Fund itself I don't believe would have had the resources to pursue the claim."); Trane Tr. 541 ("Q. Yeah, at your deposition, you were not able to say how the Fund would have paid for that litigation cost; correct? A. So what I remember from my – what I remember from my deposition was that I said there was some cash on hand, a couple hundred – a couple hundred thousand . . . .").

there still remained an asset to be managed [the indirect interest in Country Meadow], so there would be additional costs at the Fund level as well."[135]

### F. DLE Demands Fund GP Reverse Or Prevent The Disposition; Fund GP Refuses; And DLE Attempts To Remove Fund GP As The Fund's General Partner.

DLE sent a letter dated April 27 to Fund GP in response to the Holland & Knight Memorandum, demanding Fund GP "confirm" the Disposition; "confirm" the Designated Nonprofit was a "qualified nonprofit organization for the purposes of Section 42(i)(7)"; respond to the Disposition Notice; and "outline, with specificity, how [Fund GP] intend[s] to regain control of the [Property]" to the extent it was transferred, or "prevent the transfer" to the extent it was not.[136] At this point, DLE had already hired counsel and confirmed the Disposition on its own.[137] Fund GP responded with a letter dated May 3.[138] In reply, DLE sent Fund GP a Notice of

---

[135] Macari Tr. 71–72.

[136] JX208 at HUDSON00008588–90; PTO ¶ 59.

[137] PTO ¶ 57 ("Shortly after receiving the Disposition Notice, DLE retained outside counsel."); Trane Tr. 530 ("Q: After you received the property disposition notice back in April 2021, DLE had retained counsel almost immediately; correct? A: Yes, I don't remember the exact timing, but I think it was -- it was shortly -- shortly after receiving the notice. Q: And DLE's counsel confirmed within a few days of receiving the disposition notice that the transfer of title had actually occurred; correct? A: That's my recollection."); JX201 (emailing with Nixon Peabody on April 19, 2021).

[138] JX213; PTO ¶ 59.

Default dated May 10 (the "Default Notice") in an effort to remove Fund GP as general partner under Fund LPA Section 7.2A.[139]

Section 7.2A defines the procedures by and "Causes" for which the Fund's limited partners can remove Fund GP.[140]  It provides:

> [DLE] shall, by a written Notification, have the right at any time to remove the General Partner, effective immediately upon notice to the General Partner, for any of the reasons described in (i) through (viii) of this Section 7.2A (each constituting "Cause"), provided that in each case Notification of the alleged existence of Cause shall first be given to the General Partner, describing the basis for such allegation with particularity, and the General Partner shall be given 30 days to cure such alleged Cause (or such shorter period as is necessary to protect the essential interests of the Fund as determined by [DLE]);
>
> . . .

---

[139] JX218; PTO ¶¶ 60–61.

[140] Fund LPA § 7.2A.

(ii) Any breach of fiduciary duty in the performance of its duties and obligations as General Partner under this Agreement, or any act outside the scope of the duties and obligations as General Partner pursuant to this Agreement that has a material adverse effect on the Fund, or any action or inaction by the General Partner, or any of its related entities, that would qualify as an event of removal or withdrawal with respect to such General Partner under the Act;

(iii) Failure by the General Partner in any respect to comply with its representations or warranties, which failure has a material adverse effect on the Fund, or violation by the General Partner in any material respect of any other provision of this Agreement, of any agreement between the General Partner and the Investor Limited Partner or of the Act[.][141]

DLE alleged Cause under Sections 7.2A(ii) and (iii) by claiming Fund GP breached its fiduciary and contractual duties, "including, without limitation, Sections 6.3 and 6.4."[142] DLE claimed Fund GP breached its fiduciary duties and Fund LPA Sections 6.3 and 6.4 by: failing to obtain "Supermajority Consent of the Investor Limited Partners" before it purportedly "g[a]ve the consent of the Fund or an Intermediate Entity, in its capacity as a partner of the [Property] Partnership, to the sale of the [Property]"; "fail[ing] to protect [DLE]'s Interests in the Fund"; and "failing to protect the Fund's interests and investment in the [Property] Partnership."[143] According to DLE, "[t]he Property Disposition has caused significant damages to

---

[141] *Id.* §§ 7.2A(ii)–(iii); *id.* at Art. I ("'Act' means the Delaware Uniform Revised Limited Partnership Act as in effect in the State of Delaware and as amended from time to time and any successor to such statute.").

[142] JX218 at HUDSON00008228.

[143] *Id.* at HUDSON00008228.

38

the Investor Limited Partners and the failure to both timely investigate and contest such Property Disposition by the General Partner is a breach of the General Partner's fiduciary duty."[144] With the Default Notice, DLE purported to remove Fund GP as the Fund's general partner pursuant to Fund LPA Section 7.2A if Fund GP did not "cure" the alleged defaults within ten days.[145]

Fund GP responded May 14, rejecting the Default Notice as invalid.[146]

### G. Litigation Ensues.

On June 1, Plaintiffs filed suit in this Court seeking declaratory judgments pursuant to 6 *Del. C.* § 17–110, 6 *Del. C.* § 17–111, and 10 *Del. C.* § 6501 that: (a) the Default Notice is invalid because it fails to provide sufficient particularity and time to cure; (b) the Default Notice was invalid under the terms of the Fund LPA; (c) DLE lacks Cause to remove Fund GP; and (d) Fund GP has the right to continue to be general partner of the Fund.[147] On June 18, DLE filed its answer and counterclaims.[148] DLE brought two counts seeking declarations pursuant to 6 *Del. C.* § 17–110, 6 *Del. C.* § 17–111, and 10 *Del. C.* § 6501 that: (a) Fund GP breached its fiduciary and contractual duties; (b) the Default Notice is valid; (c) DLE may

---

[144] *Id.*

[145] *Id.* at HUDSON00008228–29.

[146] JX220.

[147] Compl. ¶¶ 117–29.

[148] *See generally* Countercl.

validly remove Fund GP as general partner of the Fund; (d) Fund GP is no longer general partner of the Fund; and (e) Fund GP should ensure that Fund LP cooperates with DLE in appointing a successor general partner.[149]  DLE also brought a direct claim for breach of fiduciary duty, a derivative claim for breach of fiduciary duty, and a direct claim for breach of contract.[150]

I held trial November 3 and 4 with nine witnesses and 274 joint exhibits.[151] The parties submitted post-trial briefing and I held post-trial argument on January 6, 2022.[152]  On January 11, I sent a letter indicating that trial showed that DLE never validly removed Fund GP as general partner of the fund, and that Fund GP is not liable for breach of fiduciary duty or breach of contract.[153]  That letter promised a post-trial opinion setting forth more detailed findings of fact and conclusions of law; this is that opinion.

## II.    ANALYSIS

Limited partnerships are creatures of both statute and contract.[154]  The Delaware Revised Uniform Limited Partnership Act ("DRULPA") rests on the

---

[149] *Id.* ¶¶ 79–116.

[150] *Id.* ¶¶ 117–35.

[151] D.I. 176; D.I. 179; D.I. 180.

[152] D.I. 188; D.I. 189; D.I. 194; D.I. 195.

[153] D.I. 193.

[154] *See, e.g.*, *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 1456494, at *5 (Del. Ch. Nov. 5, 2001) ("A limited partnership is a creature of both statute and contract.").

fundamental principle of freedom of contract.[155]  As an enabling statute, DRULPA

provides default provisions subject to modification by limited partnership

agreements.[156]  DRULPA contains relatively few mandates, and it explicitly assures

that contractual arrangements will be given effect to the fullest permissible extent.[157]

Although DRULPA provides default and gap-filling provisions,[158] the limited

partnership agreement serves as the primary source of rules governing the "affairs

of a limited partnership and the conduct of its business."[159]  "Thus, the provisions of

the partnership agreement define the rights and responsibilities of those who are

parties to the agreement and are afforded significant deference by the Courts."[160]

---

[155] *See* 6 *Del. C.* § 17–1101(c).

[156] MARTIN I. LUBAROFF, PAUL M. ALTMAN, SRINIVAS M. RAJU & JOSHUA J. NOVAK, DELAWARE LIMITED PARTNERSHIPS § 1.02 at 1-3 (Supp. 2022) [hereinafter "DELAWARE LIMITED PARTNERSHIPS"] ("[DRULPA]'s basic approach is to permit partners to have the broadest possible discretion in drafting their partnership agreements and to furnish answers only in situations where the partners have not expressly made provision in their partnership agreement.").

[157] 6 *Del. C.* § 17–1101(c) ("It is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements.").

[158] *See Achaian, Inc. v. Leemon Fam. LLC*, 25 A.3d 800, 803 n.10 (Del. Ch. 2011) ("Like the LLC Act, the LP Act is an enabling statute whose default rules are designed to fill gaps in the limited partnership agreement." (citing DELAWARE LIMITED PARTNERSHIPS § 1.02 at 1–3)); *Cantor Fitzgerald*, 2001 WL 1456494, at *5 ("The operative document is the limited partnership agreement and the statute merely provides the 'fall-back' or default provisions where the partnership agreement is silent.").

[159] 6 *Del. C.* § 17–101(14); *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff (El Paso Pipeline)*, 152 A.3d 1248, 1260 (Del. 2016) ("The partnership agreement sets forth the rights and duties owed by the partners.").

[160] *Cantor Fitzgerald*, 2001 WL 1456494, at *5.

Delaware's limited partnership law is "contractarian,"[161] and fundamentally regards and enforces the limited partnership agreement as a contract.[162] Our courts construe such agreements as any other contract, by effectuating the parties' intent based on the parties' words and the plain meaning of those words.[163]

At trial, the parties have the burden of proving their respective claims by a preponderance of the evidence.[164] "Proof by a preponderance of the evidence means proof that something is more likely than not."[165] This "means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not. By implication, the

---

[161] *ESG Cap. P'rs II, LP v. Passport Special Opportunities Master Fund, LP*, 2015 WL 9060982, at *9 (Del. Ch. Dec. 16, 2015).

[162] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

[163] *Id.*; *see also Sonet v. Timber Co., L.P.*, 722 A.2d 319, 323 (Del. Ch. 1998) ("Once authorized by law, the decision to adopt and operate under a particular limited liability structure is the sort of fundamental business decision that courts routinely protect. As a general matter, courts should be, and are, reluctant to import jurisprudence from one area of the law—which is loaded with notions of efficiency and fairness that are well developed for that particular context—into a separate area of the law—where many procedural and substantive aspects present in other legal regimes are only optional defaults. Mindful of that caution, I decline to rely unnecessarily on this Court's traditional analyses involving fiduciary duties in the corporate context.").

[164] *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *10 (Del. Ch. Oct. 27, 2015).

[165] *Id.* (internal quotation marks omitted) (quoting *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010)).

preponderance of the evidence standard also means that if the evidence is in equipoise" the party carrying the burden will lose.[166]

DLE claims Fund GP breached its fiduciary and contractual duties by failing to stop, cure, rescind, or unwind the Disposition, which DLE contends was improper for a host of reasons.[167] This decision concludes that Fund GP did not have a fiduciary or contractual duty to sue either Property GP or the Designated Nonprofit regarding the ROFR exercise and Disposition, or to otherwise block the Disposition, regardless of the ROFR's propriety.

Second, DLE claims the Disposition occurred in violation of DLE's direct and indirect consent rights. DLE argues the Property LPA required Property GP to seek Property SLP's consent to the Disposition, and that in turn, the Fund LPA required DLE to join in Property SLP's consent. DLE claims Fund GP breached a Fund LPA contractual obligation to ensure Property GP's compliance with the Property LPA, as well as Fund GP's own obligations under the Fund LPA. I find DLE has failed to demonstrate Fund GP breached its contractual duties in this regard, to the extent it owed them at all. DLE did not have Cause to remove Fund GP as general partner for breach of contract.

---

[166] *Id.* (internal quotation marks and footnotes omitted) (quoting *Agilent Techs., Inc.*, 2010 WL 610725, at *13, and then quoting *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015)).

[167] Countercl. ¶¶ 7, 10, 72, 74, 85, 101, 110; D.I. 184 at 30–31.

In the absence of a breach, it follows that DLE did not have Cause to remove Fund GP as general partner. The Default Notice is invalid under the terms of the Fund LPA. Fund GP remains the Fund's general partner. Fund GP is also exculpated for all breaches that do not materially adversely affect the Fund. Because DLE tried and failed to remove Fund GP as general partner, Fund GP is contractually entitled to a penalty, damages, and fee shifting. My analysis follows.

### A.    DLE Failed To Either Make A Demand On Fund GP Or Plead Demand Futility.

As an initial matter, DLE's derivative claims are dismissed for failure to comply with demand requirements. Before a limited partner brings a derivative action, the limited partner "must make a demand on the general partner[] of a limited partnership who have the authority to bring the action unless such a demand would be futile."[168] A limited partner seeking to pursue derivative claims on behalf of the partnership must "set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a general partner or the reasons for not making the effort."[169]

---

[168] DELAWARE LIMITED PARTNERSHIPS § 10.03 at 10-20.

[169] *Fannin v. UMTH Land Dev., L.P.*, 2020 WL 4384230, at *27 (Del. Ch. July 31, 2020) (internal quotation marks omitted) (quoting 6 *Del. C.* § 17–1003), *cert. denied*, 2020 WL 5198356 (Del. Ch. Aug. 28, 2020), *and appeal refused sub nom. Etter v. Fannin*, 238 A.3d 193 (Del. 2020); *see also* Ct. Ch. R. 23.1(a).

DLE failed to do so. While DLE brought Counterclaim Counts I, II, and IV derivatively, the Counterclaim does not plead demand futility with particularity, and DLE did not make any demand arguments at trial. In the absence of such a showing, the derivative claims of Counterclaim Counts I, II, and IV are dismissed.

> **B.** **DLE Failed To Demonstrate Cause For Removal Under Fund LPA § 7.2A(ii) Because Fund GP Owed Only Enumerated Fiduciary Duties Limited By The Fund LPA And The Fund's Purpose, And Fund GP Did Not Breach Them.**

I turn to DLE's direct claims, and begin by considering whether DLE had Cause to remove Fund GP for breach of fiduciary duty. This analysis starts with a consideration of the scope of Fund GP's duties.

"Delaware's limited partnership jurisprudence begins with the basic premise that, unless limited by the partnership agreement, the general partner has the fiduciary duty to manage the partnership in its interest and in the interests of the limited partners."[170] Delaware law presumes general partners owe these fiduciary duties unless they are explicitly and unambiguously disclaimed.[171] And Delaware

---

[170] *Sonet*, 722 A.2d at 322 (emphasis omitted) (citing *Boxer v. Husky Oil Co.*, 429 A.2d 995, 997 (Del. Ch. 1981)).

[171] *Id.*; *see, e.g.*, *Miller v. Am. Real Est. P'rs, L.P.*, 2001 WL 1045643, at *8 (Del. Ch. Sept. 6, 2001); *Morris v. Spectra Energy P'rs (DE) GP, LP*, 2018 WL 2095241, at *6 (Del. Ch. May 7, 2018).

courts presume general partners act on an informed basis and in the honest belief that they acted in the best interest of the partnership and the limited partners.[172]

The parties conducted this litigation as if Fund GP owed traditional, default, and unbounded fiduciary duties to the Fund and its limited partners. But as with every partnership, the general partner's duties are circumscribed by the partnership's purpose. And the Fund LPA expressly limits Fund GP's duties. Fund GP only owes a specific fiduciary duty, and is only empowered to act within the scope of the Fund's enumerated purpose.[173] Fund GP's decision not to sue over the Disposition falls outside the purpose of the Fund, Fund GP's authority, and the Fund LPA's expressly enumerated fiduciary duty. It is not, and cannot be, a breach of fiduciary duty.

### 1. Fund GP Cannot Owe A Fiduciary Duty To Act Inconsistently With The Fund's Purpose.

A partnership is fundamentally a creature of agency: the limited partners appoint the general partner as their agent only for the purpose they all set for the partnership.[174] That appointment is also the source of the general partner's fiduciary

---

[172] *Zoren v. Genesis Energy, L.P.*, 836 A.2d 521, 528 (Del. Ch. 2003).

[173] The Court's duty is to read the Fund LPA as a whole and give effect to the partners' intentions as set forth therein, regardless of how those parties interpret their contract at trial. *See Salamone v. Gorman*, 106 A.3d 354, 368–69 (Del. 2014); *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). The Court is also bound to ensure this decision is consistent with Delaware's bedrock principles of agency law. *See* D.R.E. 202(a) ("Every court in this State must take judicial notice of the . . . common law . . . of this State.").

[174] *See, e.g.*, DELAWARE LIMITED PARTNERSHIPS § 1.02 at 1-4 ("[DRULPA] gives partners virtually unfettered discretion to define contractually their business understanding, and

duties: a general partner owes fiduciary duties to the partnership and the limited partners because it is their agent.[175] Because a limited partner links arms with a general partner for a specific purpose, the general partner only has the authority to act as the limited partner's agent in pursuit of that purpose, and so only owes the limited partner fiduciary duties to act in pursuit of that purpose. A limited partnership's purpose circumscribes the authority, and therefore the duties, of its general partner.

The Delaware Uniform Partnership Law makes plain that a partnership's purpose delineates a general partnership's grant of agency authority. It states that "[e]ach partner is an agent of the partnership for the purpose of its business, purposes or activities."[176] "[A] partner has authority to bind the partnership only with respect to acts the partner performs within the ordinary course of the partnership

---

then, provides assurance that their understanding will be enforced in accordance with the terms of their partnership agreement.").

[175] *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 132 A.3d 67, 83 n.5 (Del. Ch. 2015), *rev'd sub nom. on other grounds El Paso Pipeline GP*, 152 A.3d 1248; 6 *Del. C.* § 17–403(a); 6 *Del. C.* § 15–301(1); *Sonet*, 722 A.2d at 322.

[176] 6 *Del. C.* § 15–301(1). So too for general partners: DRULPA Section 17–403(a) states "[e]xcept as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the rights and powers and is subject to the restrictions of a partner in a partnership that is governed by the Delaware Uniform Partnership Law." 6 *Del. C.* § 17–403(a); *Kan. RSA 15 Ltd. P'ship v. SBMS RSA, Inc.*, 1995 WL 106514, at *2 (Del. Ch. Mar. 8, 1995) (stating that a limited partnership's "general partner's powers are the same as those of [] partners of a general partnership" (citing 6 *Del. C.* § 17–403)); *see also* Fund LPA § 6.2B ("The General Partner shall, except as otherwise provided in this Agreement or in [DRULPA], have all the rights and powers and be subject to all the restrictions of partners in a partnership without limited partners.").

business."[177]  "[A]n act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners."[178]  Because "the general partner's powers are the same as those of [] partners of a general partnership . . . , the general partner may not bind the partnership to a transaction 'which is not apparently for the carrying on of the business of the partnership in the usual way . . . .'"[179]  For contractarian alternative entities, like limited partnerships, the *ultra vires* doctrine remains a meaningful limitation on agent authority.[180]

---

[177] *Rudnitsky v. Rudnitsky*, 2000 WL 1724234, at *5 n.15 (Del. Ch. Nov. 14, 2000) (noting the Delaware Uniform Partnership Act, Delaware Revised Uniform Partnership Act, and hornbook law provide agency law is the bedrock of partnership authority and quoting 6 *Del. C.* § 15–301); *accord Miller v. Gilbert*, 1979 WL 2709, at *8 (Del. Ch. May 11, 1979) ("[E]very partner is an agent for the business and the act of every partner for apparently carrying on in the usual way the business of the partnership binds the partnership. Conversely, acts which are not for apparently carrying on the business of the partnership do not bind it.").

[178] DELAWARE LIMITED PARTNERSHIPS § 4.16 at 4-35 (citing 6 *Del. C.* § 1509(b) (repealed by the 1999 Delaware Revised Uniform Partnership Act and reappearing in 6 *Del. C.* § 15–301(2))); *accord* 6 *Del. C.* § 15–301(2) ("An act of a partner which is not apparently for carrying on in the ordinary course the partnership's business, purposes or activities or business, purposes or activities of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners.").

[179] *Kan. RSA 15,* 1995 WL 106514, at *2 (emphasis omitted) (citing 6 *Del. C.* § 17–403 and quoting 6 *Del. C.* § 1509(b) (repealed by the 1999 Delaware Revised Uniform Partnership Act and reappearing in 6 *Del. C.* § 15–301(2)))).

[180] *See, e.g.*, *Symbiont.io, Inc. v. Ipreo Hldgs., LLC*, 2021 WL 3575709, at *43 & n.25 (Del. Ch. Aug. 13, 2021) (collecting cases).

For corporations, "the *ultra vires* doctrine is largely a relic of the past because the DGCL retains only three limitations on corporate capacity or power." *Sciabacucchi v. Salzberg*, 2018 WL 6719718, at *19 n.119 (Del. Ch. Dec. 19, 2018), *rev'd on other*

*grounds*, 227 A.3d 102 (Del. 2020); 8 *Del. C.* § 124 ("No act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was without capacity or power to do such act . . . , but such lack of capacity or power may be asserted: [in three enumerated instances]."); *Se. Pa. Transp. Auth. v. Volgenau*, 2012 WL 4038509, at *2 (Del. Ch. Aug. 31, 2012) ("Section 124[] focus[es] on the validity of corporate acts . . . to prevent both corporations and those contracting with them from avoiding contracts that could be classified as outside the scope of the corporation's authorized powers. . . . Section 124 does not bar all challenges to the acts it covers. It merely provides that certain acts may not be set aside because they are *ultra vires*. A corporation's act, through its directors, may be deemed valid and effective, but the act may nevertheless constitute a breach of fiduciary duty." (alterations and internal quotation marks omitted) (quoting David A. Drexler et al., *Delaware Corporation Law and Practice*, § 11.05 (2011)), *aff'd*, 91 A.3d 562 (Del. 2014); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 648–54 (Del. Ch. 2013) (discussing the largely outdated concept of "capacity or power" and its relationship to the *ultra vires* doctrine within the context of Section 124), *abrogated on other grounds by El Paso Pipeline GP*, 152 A.3d at 1264 n.83.

Thus, where alternative entity fiduciaries can be restrained to pursue only a governing purpose, corporate fiduciaries draw freedom to pursue the corporation's long-term purpose from the business judgment rule. *Compare Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 WL 506906, at *13 (Del. Ch. Sept. 3, 1996) (holding the general partner's "responsibility is to manage the Partnership in accordance with its purpose" and the general partner "is under no fiduciary obligation to abandon that purpose"), *with, e.g.*, *Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1153 (Del. 1989) ("Indeed, in our view, precepts underlying the business judgment rule militate against a court's engaging in the process of attempting to appraise and evaluate the relative merits of a long-term versus a short-term investment goal for shareholders."), *and id.* at 1154 ("Directors are not obliged to abandon a deliberately conceived corporate plan for a short-term shareholder profit unless there is clearly no basis to sustain the corporate strategy."), *and Air Prod. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 124–25 (Del. Ch. 2011) ("This course of action has been clearly recognized under Delaware law: 'directors, when acting deliberately, in an informed way, and in the good faith pursuit of corporate interests, may follow a course designed to achieve long-term value even at the cost of immediate value maximization.'" (quoting *Paramount Commc'ns, Inc. v. Time Inc.*, 1989 WL 79880, at *19 (Del. Ch. July 14, 1989))). "A corporation nevertheless retains the ability to impose limitations on (and create uncertainty about) its capacity or power by including provisions in its charter that forbid it from entering into particular lines of business or engaging in particular acts." *Sciabacucchi*, 2018 WL 6719718, at *19 n.119.

Because partnerships are creatures of contract, the partnership agreement's purpose clause can offer particularized boundaries on the general partner's authority.[181] "A Delaware limited partnership is permitted to carry on any lawful business, purpose or activity, whether or not for profit."[182] But a partnership agreement "[t]ypically . . . has a description of the purposes of the limited partnership, the powers of the limited partnership and the restrictions on particular limited partnership activity."[183] The partnership agreement may also specifically enumerate the rights, powers, and restrictions of the general partner.[184] "Thus, in determining if a particular Delaware limited partnership has the partnership power to engage in a particular business activity, . . . an analysis must be made of the partnership agreement of such limited partnership.[185] "A purpose clause that places limits on what an entity can do deprives the entity of the authority to engage in activities that otherwise would be permissible under default principles of law."[186]

---

[181] *See Cincinnati Bell*, 1996 WL 506906, at *13.

[182] DELAWARE LIMITED PARTNERSHIPS § 3.11 at 3-33.

[183] *Id.* at 3-34.

[184] *Id.* § 4.16 at 4-36 (citing *Kan. RSA 15.,* 1995 WL 106514); 6 *Del. C.* § 15–301(2).

[185] DELAWARE LIMITED PARTNERSHIPS § 3.11 at 3-34; *see also U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *9 (Del. Ch. June 6, 1996) (stating the Court's "ultimate guide" in determining the scope of a party's rights and obligations "is to attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted").

[186] *Symbiont.io*, 2021 WL 3575709, at *43 ("A limited purpose clause can result in a court holding that the action was invalid."); *CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 816–17 (Del. 2018) (holding that when an operating agreement contains plain

"The stated purpose of the limited partnership is significant because if the proposed transaction is itself within the purpose of the partnership th[e]n, of course, the general partner may lawfully authorize and effectuate the transaction."[187]

The purpose clause is not the only available evidence of the partnership's purpose. In addition, "the Court may consider the partnership's stated purposes, the precedent set by the partnership's prior 'custom or course of dealing' and 'the general custom' of analogous partnerships."[188] "A sensible interpretation of precedent is that the purpose clause is of primary importance, but other evidence of purpose may be helpful as long as the Court is not asked to engage in speculation."[189]

This Court's jurisprudence offers a few examples of invalidating acts because they were inconsistent with the partnership's usual business. "[I]n a case where the stated purpose of a partnership was to own and operate a building, a contract to compensate a third party for services in finding investors for a partnership, was not

---

language indicating that an act is "'void and of no force or effect whatsoever'—its application would trump the common law rule" and render equitable defenses inapplicable); 6 *Del. C.* § 17–106(b) ("A limited partnership shall possess and may exercise all the powers and privileges granted by this chapter or by any other law or by its partnership agreement, together with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the limited partnership.").

[187] *Kan. RSA 15,* 1995 WL 106514, at *2.

[188] *Rudnitsky*, 2000 WL 1724234, at *6 (citing 59A Am Jur.2d, Partnership § 264 (1987), and *Abt v. Harmony Mill Ltd. P'ship,* 1992 WL 380615, at *3 (Del. Ch. Dec. 18, 1992)).

[189] *Meyer Nat. Foods LLC v. Duff*, 2015 WL 3746283, at *4 (Del. Ch. June 4, 2015).

'carrying on the business of the partnership' within the meaning of 6 *Del. C.* § 1509(b)."[190]  In another example, where the partnership's purpose was to own and operate a building, mortgaging that building to procure funds for unrelated purposes did not fall within the ordinary course of the partnership's business, and therefore was invalid.[191]  And even actions that the partnership agreement facially contemplates the general partner can pursue are not feasible if they conflict with the partnership's purpose.[192]

The partnership's purpose limits the general partner's authority and therefore circumscribes its fiduciary duties.  "An agent has a duty to take action only within the scope of the agent's actual authority."[193]  Because a general partner only has the authority to act in furtherance of the partnership's purpose, it cannot owe a duty

---

[190] *Rudnitsky*, 2000 WL 1724234, at *6 (citing *Abt,* 1992 WL 380615, at *3).  As explained, 6 *Del. C.* § 1509(b) was repealed by the 1999 Delaware Revised Uniform Partnership Act and reappears in 6 *Del. C.* § 15–301(2).

[191] *Rudnitsky*, 2000 WL 1724234, at *6.

[192] *Schwartzberg v. CRITEF Assocs. Ltd. P'ship*, 685 A.2d 365, 366, 375–77 (Del. Ch. 1996) (precluding a general partner from exercising information rights in the partnership agreement where access was sought "to facilitate his attempt to replace the Partnership in its sole activity," which purpose was "fundamentally and importantly in conflict with the interests of the Partnerships and is an improper purpose from the point of view of the Partnerships"); *cf. Nero v. Littleton*, 1998 WL 229526, at *4 (Del. Ch. Apr. 30, 1998) (declining to dismiss petitioner's claim that "Respondent breached the fiduciary duties he owed to her by expending partnership assets for purposes unrelated to the Partnership's business").

[193] Restatement (Third) Of Agency § 8.09(1) (Am. L. Inst. 2006); *see also id.* § 2.02 cmt. e ("An agent's actual authority encompasses acts necessary to accomplish the end the principal has directed that the agent achieve."); *id.* § 2.02 cmt. c, illus. 22 (circumscribing the agent's duties within the principal's known "long-term business plan").

inconsistent with that purpose.[194]   Where a partnership agreement sets forth a specific purpose for the partnership, and grants the general partner powers in furtherance of that purpose, the general partner has no authority to take an act contrary to that purpose, and so failure to take that act cannot be a breach of fiduciary duty.[195]

This Court has held that because a partnership's purpose limits a general partner's fiduciary duties, a failure to take an *ultra vires* act cannot be a breach of fiduciary duty.  In *Cincinnati Bell Cellular Systems Co. v. Ameritech Mobile Phone Services of Cincinnati, Inc*, plaintiff and limited partner Cincinnati Bell Cellular Systems sued defendant and general partner Ameritech Mobile Phone Services of Cincinnati alleging the general partner committed gross negligence and breached its fiduciary duties by failing to sell the partnership.[196]   The limited partner argued,

---

[194] *Id.* § 8.09(1) ("An agent has a duty to take action only within the scope of the agent's actual authority."); *id.* § 2.02(1) ("An agent has actual authority to take action designated or implied in the principal's manifestations to the agent and acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act."); *see also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012) ("For Section 17–1101(d) to say that fiduciary duties can be restricted or eliminated '[t]o the extent that . . . a partner or other person' owes fiduciary duties acknowledges these situationally specific possibilities and recognizes that epistemological questions about the extent to which a partner or other person owes duties will be answered by the role being played, the relationship to the entity, and the facts of the case.").

[195] *Cincinnati Bell*, 1996 WL 506906, at *13.

[196] *Id.* at *1.

among other things: (1) the purpose of the partnership was to "generate economic returns"; (2) the general partner owed a duty to sell the partnership to fulfill the partnership's purpose; and (3) the general partner breached that purported duty by failing to sell and not fulfilling the purported purpose.[197]

Then-Vice Chancellor Chandler rejected those arguments.[198] The parties' limited partnership agreement stated the partnership's purpose was "to fund, establish and provide Cellular Service" in the specified geographic area; the purpose was not to generate economic returns.[199] "The general partner is given broad powers in furtherance of this purpose—to market, sell and maintain cellular services in the limited geographic area for which the Partnership is licensed. In a fundamental sense, selling the Partnership's business would be contrary to the Partnership's stated purpose."[200] Under the partnership agreement, the general partner had no right or authority to sell the partnership's assets with anything less than unanimous consent.[201] The Court held:

---

[197] *Id.* at *5, *9.

[198] *Id.* at *7, *9–13.

[199] *Id.* at *5.

[200] *Id.* at *10.

[201] *Id.* at *10–11.

Unless it is not reasonably practicable to carry on the business in conformity with its purpose or unless all the partners agreed to a dissolution of the business, [the general partner] is under a duty to carry out the Partnership's purpose as expressed in the Partnership Agreement. If a partner does not share [the general partner]'s vision of the Partnership's viability in the cellular market, that partner retains the right under the Partnership Agreement to cash out its interest in the Partnership or to withdraw from the Partnership.[202]

The Court concluded the general partner's "responsibility is to manage the Partnership in accordance with its purpose," and so the general partner did not have a "fiduciary obligation to abandon that purpose and sell the business because one limited partner—Cincinnati Bell—believes it would be in its own strategic business interest to do so."[203]

Here, the Fund was formed as a limited partnership.[204] The Fund LPA specifies the Fund's purpose:

---

[202] *Id.* at *13.

[203] *Id.*

[204] PTO ¶ 2; Fund LPA at 2, Recitals.

> The purpose and character of the business of the Fund is to offer and sell Units and to acquire, hold, sell, dispose of and otherwise deal (directly or indirectly through an Intermediate Entity) with Property Partnership Interests in Approved Property Partnerships, including all activities necessary or incidental to the foregoing.[205]

"'Unit' means a limited partner interest in the Fund representing a Capital Contribution of $1 million."[206] "Property Partnership Interests" are limited partner or member interests of the Fund in Property Partnerships, which in turn are "each formed to own a Property."[207] "'Property' means an affordable housing property constructed, rehabilitated or acquired or to be constructed, rehabilitated or acquired by a Property Partnership, which property is or is planned to be eligible for Tax Credits."[208] And "Tax Credits" are Section 42 tax credits.[209] Applying these nested definitions, the Fund's purpose is to sell stakes in, and hold interests in, partnerships that in turn hold affordable housing properties that are or are planned to be eligible for Section 42 tax credits.[210]

---

[205] Fund LPA § 2.3; *see also* Fund LPA § 6.3A(xxvi) ("Without the Consent of the Investor Limited Partners, but subject to Section 6.3.B hereof, [Fund GP] shall not: . . . (xxvi) change the Fund's purpose from those set forth in Section 2.3 hereof[.]"); First Amendment at HUDSON00018167.

[206] Fund LPA at Art. I.

[207] *Id.*

[208] *Id.*

[209] *Id.*

[210] DLE points to the Property Partnership's purpose as evidence it is entitled to "long-term appreciation." *E.g.*, Post-Trial Tr. 101–02; Property LPA § 3.01 ("The [Property] Partnership has been organized exclusively to acquire the Land and to develop, finance, construct, own, maintain, operate and sell or otherwise dispose of the [Property], in order

Other evidence supports that the Fund's purpose was to syndicate the exchange of capital for tax credits.[211] First, the many Fund and Property forecasts reflect the partners' reasonable shared expectations for the partnership: (1) the Credit Period for Kate's Trace would end around 2015; (2) the Compliance Period for Kate's Trace would end around 2020; (3) the Section 42 ROFR went into effect "beginning in 2020 at the minimum purchase price"; (4) the Section 42 ROFR would result in a disposition of the Property; and (5) the Section 42 ROFR "results in no value" to Property LP, the Fund, or the Fund's partners.[212] In 2004, the Fund's original partners created a forecast for Kate's Trace Apartments providing for $5,300,917 in investor contributions, and $7,488,306 in total investor tax benefits, including credits and losses, with the Compliance Period ending on December 31,

---

to obtain for the Partners long-term appreciation, cash income, and tax benefits consisting of Tax Credits and tax losses over the term hereof."). DLE is not a partner to the Property Partnership or party to the Property LPA, and therefore, is owed no duties under the Property LPA. *Abt*, 1992 WL 380615, at *4 ("Every party whose rights are affected by a contract is not necessarily a party thereto.").

[211] *Meyer Nat. Foods*, 2015 WL 3746283, at *4; *Rudnitsky*, 2000 WL 1724234, at *6.

[212] JX004 at HUDSON00018773; JX011 at DLE_0005420; JX014 at DLE_0007799–801; JX058 at DLE_0002308; JX037 at DLE_0004085; JX089 at DLE_0001819; Chiusano Tr. 390, 392–98; 400–01, 405–06, 410–11; Trane Tr. 520; Hickey Tr. 242–43; PTO ¶ 40; Fund LPA § 3.3A(ii) ("The Investor Limited Partner[s] and the General Partner acknowledge that such Forecasts will reflect the General Partner's good faith best estimate, as of the date thereof, of the future performance of the Fund . . . ."); Macari Tr. 32, 62.

2019.[213]  Net operating income was forecasted to be $342,319 per year,[214] and cash flows were projected to total $1,204,733 in 2020;[215] these operations resulted in tax losses, as intended.[216]  Income was not included on the "Investor Benefits Schedule," which reflects only tax losses and tax credits.[217]  This forecast is consistent with the Fund LPA's pronouncement that the purpose of the partnership was to facilitate the exchange of investment for tax benefits; income from operating the Property was not in the black.  The forecast ended at the end of the Compliance Period, reflecting the intended disposition of the Property to a designated nonprofit.[218]

As an Investor Limited Partner, DLE's forecasts, projections, and analyses reflected these same expectations.  In 2008, DLE's forecast projected tax credits through 2015, and "Taxable Income/(Loss)" and "Annual After Tax Benefits" through 2020.[219]  DLE's forecast predicted a loss each year from 2008 through 2020, and zero income in 2007 and 2021 through 2025; the forecast never projected

---

[213] JX004 at HUDSON00018773, HUDSON00018790–91 (forecasting the tax credits through 2015).

[214] *Id.* at HUDSON00018775.

[215] *Id.* at HUDSON00018780–81.

[216] *Id.* at HUDSON00018790.

[217] *Id.* at HUDSON00018791.

[218] Macari Tr. 30, 32, 62; JX014 at DLE_0007799–801; JX015; JX058 at DLE_0002308.

[219] JX011 at DLE_0005420; Trane Tr. 520.

positive taxable income.[220]  In 2016, DLE created an "Upper Tier," or Fund-level, forecast reflecting its understanding that Kate's Trace's Compliance Period ended in 2020 and it was subject to a ROFR.[221]  A 2019 internal "Disposition Analysis" excerpts annotated text from the Property LPA Sections 8.02(b)–(e), Fund LPA Section 6.3A, Kate's Trace Limited Partnership Financial Statements,[222] and Code Section 42(i)(7)(B) evidencing anticipation of a Section 42 disposition under Section 8.02(e).[223]  And a July 2020 "Weekly Detailed Analysis Discussion" included an agenda item stating "Kate's Trace – lower tier GP has ROFR at debt plus taxes," which is the Section 42 price.[224]  DLE's internal evaluations, including those created after Hunt assumed its ownership and management, evidence a consistent understanding and expectation that Kate's Trace would be sold under the ROFR, and that no value would flow to DLE after the Compliance Period.  This progressive

---

[220] JX011 at DLE_0005420; Trane Tr. 520–21.  This progressive decrease in value is reflected in the discounted price at which DLE purchased its interests in the Fund.

[221] JX015.

[222] JX066; *see also id.* ("Each Building of the Project must meet the provisions of [Section 42] regulations during each of 15 consecutive years in order to remain qualified to receive the [tax] credits.  In addition, the Partnership entered into an Extended Use Agreement, which requires the utilization of the Project pursuant to Section 42 for a minimum of 35 years after the compliance period, even if the Partnership disposes of the Project.").

[223] *Id.*

[224] JX087.

decrease in value as the ROFR date grew nearer is also reflected in the discounted

price at which DLE purchased its interests in the Fund in 2007.[225]

In addition to the Fund LPA's language and requisite forecasts, evidence at

trial illustrated that Fund GP's mission was to preserve the Property as affordable

housing under the LIHTC program.[226]  Fund GP's representative testified:

> I think it was always the expectation -- again, I think it's, you know, part of the legislative intent, part of the expectation of the partners, it's industry practice, that at the end of the day, these properties with nonprofits end up in the hands of the nonprofit who developed the property.[227]

The Fund's course of conduct through the end of the Property's Compliance

Period was consistent with its stated purpose:  it exchanged investor dollars for tax

credits, and its original investors exited the Fund once the tax credits were

distributed.[228]  After the properties' tax credits were harvested, the Fund's stake in

the Property Partnerships offered no Section 42 value to investors, so the Fund could

no longer sell million-dollar Units to investors.[229]  And, fundamentally, the Fund is

---

[225] *Compare* JX004 at HUDSON00018773 (showing $4,788,565 of First Chicago's projected capital contributions before the end of the Credit Period), *with* JX011 at DLE_0005420 (showing a $2,571,381 purchase price in 2007, before the end of the Credit Period).

[226] Macari Tr. 112; JX040; JX114 at HUDSON00013635 ("[DLE's] position is as I feared, an aggregator without consideration of the mission.").

[227] Macari Tr. 62.

[228] Fund LPA § 2.3.

[229] *See* JX004 at HUDSON00018773 (showing $4,788,565 of First Chicago's projected capital contributions before the end of the Credit Period); JX011 at DLE_0005420

a LIHTC partnership: its source of value and reason for formation is to participate in the LIHTC program, which features the ROFR as a means of extending the property's viability as affordable housing beyond the Compliance Period.[230]

In sum, the Fund's purpose was to offer and sell limited partner interests, and to hold interests in Property Partnerships that in turn hold properties that are or are planned to be eligible for tax credits. In so many words, the Fund's purpose was to syndicate the exchange of capital for tax credits. The Fund's purpose is to invest in properties that "[are] or [are] planned to be eligible for Tax Credits"[231]—not properties that are no longer eligible for tax credits.

---

(showing a $2,571,381 purchase price in 2007, before the end of the Credit Period); Trane Tr. 521 ("Q: And DLE's interest in Kate's Trace was priced based off of its being projected to receive these benefits through 2020; correct? A: Yes, that is correct."); Macari Tr. 19–20 (describing how First Chicago sold its interests for "less than $200,000" in 2017, after the Credit Period).

[230] *Opa-Locka*, 2020 WL 4381624, at *3 ("But the LIHTC program's aim of creating and preserving low-income housing does not end at thirty years. Rather, the LIHTC program seeks to preserve low-income housing in perpetuity by creating a special role for nonprofits, like OLCDC, whose missions are not to profit from a sale of the low-income housing project, but to continue to develop and preserve the low-income housing in perpetuity for the betterment of the public and the community in which project is located."); *see also, e.g.*, JX021 at DLE_0001175 ("Each Building of the Project must meet the provisions of [Section 42] regulations during each of 15 consecutive years in order to remain qualified to receive the [tax] credits. In addition, the Partnership entered into an Extended Use Agreement, which requires the utilization of the Project pursuant to Section 42 for a minimum of 35 years after the compliance period, even if the Partnership disposes of the Project.").

[231] Fund LPA at Art. I (defining "Property").

This purpose, syndicating investment for tax credits, circumscribes Fund GP's authority and fiduciary duties. As a matter of contract and of agency principles, Fund GP lacks authority to act inconsistently with the Fund's purpose.[232] Fund GP is an agent of the Fund "for the purpose of its business, purposes or activities."[233] The Fund LPA authorizes Fund GP only to take actions "necessary to, or in connection with, the accomplishment of the purposes of the Fund."[234] It specifies that Fund GP lacks authority to cause the Fund to invest in anything other than Property Partnership Interests (tied to a Property that is or will be eligible for tax credits).[235] And it requires specific consent from the Investor Limited Partners to "cause the Fund to participate in the development, leasing, operation or disposition

---

[232] *Symbiont.io*, 2021 WL 3575709, at *43; Restatement (Third) Of Agency § 8.09(1) (Am. L. Inst. 2006) ("An agent has a duty to take action only within the scope of the agent's actual authority."); *Cincinnati Bell*, 1996 WL 506906, at *10 ("The general partners' power to market, sell, operate and maintain the cellular service system is necessary for carrying out the Partnership's business purpose—promoting and providing cellular services to subscribers. Based on the terms of the Partnership Agreement, I conclude as a matter of law that Ameritech, as the general partner, has no authority to sell the Partnership's business.").

[233] 6 *Del. C.* § 15–301(1).

[234] Fund LPA § 6.2A(xi); *cf. id.* § 6.4F ("The General Partner shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Fund.").

[235] *Id.* § 6.3A(xxi); *id.* at Art. I ("'Property Partnership Interests' means the limited partner or member interests of the Fund (directly or indirectly through an Intermediate Entity) in the Property Partnerships."); Fund LPA at Art. I ("'Property' means an affordable housing property constructed, rehabilitated or acquired or to be constructed, rehabilitated or acquired by a Property Partnership, which property is or is planned to be eligible for Tax Credits.").

of a Property, except as required to exercise the rights of the Fund under the Property Partnership Agreements[.]"[236]  Fund GP does not have authority as general partner to participate in the disposition of a Property unless the Property LPA or the limited partners specifically consent.  Otherwise, Fund GP only has the authority to act consistently with the Fund's purpose of syndicating investment for tax credits.  Fund GP cannot and did not owe a duty to act inconsistently with that purpose.[237]

### 2.  The Fund LPA Further Restricts The Scope Of Fund GP's Fiduciary Duties.

In addition to being circumscribed by the partnership's purpose, a general partner's fiduciary duties may be expressly modified by the limited partnership agreement.  DRULPA Section 17–1101(d) permits parties to "expand[] or restrict[] or eliminate[]" a general partner's fiduciary duties "by provisions in the partnership agreement."[238]  The exercise of determining the nature and scope of a general partner's fiduciary duties is a contractual exercise, requiring the Court to consider

---

[236] Fund LPA § 6.3A(xxiv).

[237] Restatement (Third) Of Agency § 8.09(1) (Am. L. Inst. 2006) ("An agent has a duty to take action only within the scope of the agent's actual authority."); *Cincinnati Bell*, 1996 WL 506906, at *13 ("Unless it is not reasonably practicable to carry on the business in conformity with its purpose or unless all the partners agreed to a dissolution of the business, Ameritech is under a duty to carry out the Partnership's purpose as expressed in the Partnership Agreement.").

[238] 6 *Del. C.* § 17–1101(d); *Ryan v. Buckeye P'rs, L.P.*, 2022 WL 389827, at *9 (Del. Ch. Feb. 9, 2022).

"the reasonable shared expectations of the parties at the time they contracted."[239]

Where a limited partnership agreement does not clearly and unequivocally eliminate or limit fiduciary duties, the general partner owes default fiduciary duties.[240] "[A]greements' drafters must [expand, restrict, or eliminate fiduciary duties] clearly, and should not be incentivized to obfuscate or surprise investors by ambiguously stripping away the protections investors would ordinarily receive."[241] An expanded or restricted "'contractual fiduciary duty' is a fiduciary duty (1) the scope of which is established by contract; or (2) compliance with which is measured by a contractual standard."[242]

The Fund LPA contractually restricts the scope of Fund GP's fiduciary duties. It enumerates a particular fiduciary duty, and expressly and repeatedly states that only that duty is owed. Section 6.4F provides:

---

[239] *U.S. W., Inc.*, 1996 WL 307445, at *9 ("Of course, the nature and scope of the rights and obligations created will often be the primary issue to resolve. The court's ultimate guide in determining those legal entitlements is to attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted."); *see also Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1234 (Del. Ch. 2000) ("The parties' reasonable expectations at the time of contract formation determine the reasonableness of the challenged conduct.") (citing *Schwartzberg*, 685 A.2d at 376)).

[240] *Feeley*, 62 A.3d at 662.

[241] *Largo Legacy Gp., LLC v. Charles*, 2021 WL 2692426, at *17 (Del. Ch. June 30, 2021) (internal quotations omitted) (quoting *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261, at *15 (Del. Ch. Sept. 4, 2014)).

[242] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *14 (Del. Ch. July 6, 2018) (citing *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2819005, at *19 (Del. Ch. June 20, 2014)).

The General Partner shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Fund, whether or not in its immediate possession or control. The General Partner shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Fund.[243]

The Fund LPA does not enumerate any other fiduciary duties. Section 6.4J confirms that the duty in Section 6.4F replaces default fiduciary duties:

To the extent that, at law or in equity, the General Partner or its Affiliates has duties (including fiduciary duties) and liabilities relating thereto to the Fund or to the Partners, the General Partner and its Affiliates acting in connection with the Fund's business or affairs shall not be liable to the Fund or to any Partner for its good faith reliance on the provisions of this Agreement except to the extent of their gross negligence, willful misconduct or breach of fiduciary duty. ***The provisions of this Agreement are agreed by the Partners to replace such other duties and liabilities of such Person***.[244]

With this, Fund GP owes only the fiduciary duties expressly provided in Section 6.4F.[245]

Other provisions in the Fund LPA acknowledge this limitation of Fund GP's fiduciary duties. Several sections describe Fund GP's fiduciary duties merely as those "set forth in this Agreement," including the provision governing removal of

---

[243] Fund LPA § 6.4F.

[244] *Id.* § 6.4J (emphasis added).

[245] *See Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 95, 100–01 (Del. 2013) (affirming the Court of Chancery in finding "[t]he limited partnership agreement replaces common law fiduciary duties with a contractually adopted fiduciary duty of subjective good faith," so "Encore GP and each Indemnitee only owe the fiduciary duties expressed in the LPA; they do not owe common law fiduciary duties").

the general partner for "[a]ny breach of fiduciary duty in the performance of its duties and obligations as General Partner *under this Agreement*."[246] Otherwise, subject to limited partners' consent rights and express limitations on authority, "the General Partner [has] the full, complete and exclusive discretion and authority to manage and control the business of the Fund."[247] Fund GP is authorized, "without limitation," "to cause the Fund . . . to perform and fulfill its obligations under each Property Partnership Agreement of each Property Partnership . . . ."[248]

And so, under the Fund LPA, Fund GP owes only a fiduciary duty toward the "safekeeping and use of all funds and assets of the Fund . . . . for the exclusive benefit of the Fund."[249] The Fund LPA clearly and unambiguously modifies Fund GP's default fiduciary duties as general partner of the Fund.[250] Fund GP does not owe the default duties of loyalty and care.

---

[246] Fund LPA § 7.2A(ii) (emphasis added); *id.* § 6.7A ("fiduciary duty set forth in this Agreement"); *id.* § 6.7B ("fiduciary duty set forth in this Agreement").

[247] *Id.* § 6.1A.

[248] *Id.* § 6.2A(vi).

[249] *Id.* § 6.4F.

[250] *See Kahn v. Icahn*, 1998 WL 832629, at *3 (Del. Ch. Nov. 12, 1998) (holding that limited partners could not bring a duty of loyalty claim where the partnership agreement contained "clear and unambiguous modifications of fiduciary duties"), *aff'd* 746 A.2d 267 (Del. 2000); *see also supra* note 171.

### 3. Fund GP Did Not Breach Any Fiduciary Duties And So, Was Not Validly Removed For Such A Breach.

With the Fund's purpose and LPA so limiting Fund GP's fiduciary duties, I turn to DLE's claim of breach of fiduciary duty. DLE asserts Fund GP breached its duty under Section 6.4F, to safeguard "all funds and assets of the Fund," by not taking "action to invalidate or otherwise challenge" the Disposition after what DLE asserts was an invalid exercise of the ROFR.[251] DLE claims that the Property is worth approximately $9.65 million, and "was a valuable Fund asset as it had unrealized equity value as well as ongoing tax and other economic benefits by virtue of the Fund's ongoing ownership through the Property Partnership,"[252] DLE claims Fund GP failed to protect DLE's investment by declining to challenge the Disposition "without considering DLE's contrary position as to the potential long term value of holding the [Property]."[253] DLE contends Fund GP should have used

---

[251] D.I. 165 at 28; Countercl. ¶¶ 7, 10, 72, 74, 85, 101, 110; D.I. 184 at 30–31. DLE asserted deficiencies in Fund GP's investigation into the Disposition are tantamount to a failure to investigate such that it is a second breach. *See* Countercl. ¶ 63; D.I. 165 at 28; D.I. 184 at 43–48; D.I. 188 at 6–9, 36, 39. Because I conclude Fund GP owed no duty to stop the Disposition, the quality of its investigation also cannot be the source of a breach.

[252] D.I. 165 at 49.

[253] D.I. 184 at 1, 18, 49; D.I. 188 at 39; JX150 at HUDSON00000099 (valuing the Property between $9,3000,000 and $10,000,000 in a BOV for DLE); *see also* Kagey Tr. 471 ("Q: Tell us, what is the role of Hunt Capital Partners with regard to DLE's interest in [the Fund]? A: Hunt Capital Partners is the authorized representative. It's the asset manager of DLE. Q: In the role as asset manager, what is Hunt's objective for the DLE investment? A: Hunt's objective for the DLE investments is to maximize the return, the yield, to its owners.").

the Fund's approximately $200,000 in cash reserves to conduct an additional or different investigation into the Disposition, and to sue Property GP or one of its affiliates following the Disposition.[254]   By not stopping Property GP from transferring the Property to the Designated Nonprofit, DLE argues, Fund GP failed to safeguard the assets of the Fund, in breach of Fund LPA Section 6.4F.

DLE's theory of breach breaks apart in three places.  First, the Property itself is not an asset of the Fund, so Fund GP owes no duty to safeguard the Property. Second, while Fund GP has a duty to safeguard the value of Property Partnership Interests as Fund assets, that value is based on tax benefits and credits; the duty to safeguard that value does not extend to maximizing or chasing other sources of value.  And finally, DLE's expectation that Fund GP challenge the Disposition is fundamentally inconsistent with the Fund's purpose, and so Fund GP owes no duty to do so.  Fund GP only owes a duty toward "the safekeeping and use of all funds and assets of the Fund" to the extent consistent with the Fund's purpose.[255]

As an initial matter, the Property itself is an asset of the Property Partnership, not the Fund.  Fund assets include cash and the Fund's interest in Property LP and

---

[254] Macari Tr. 71–72; D.I. 184 at 20 ("[T]he Fund had approximately $250,000 cash at the time of the [Disposition].  That was more than enough to conduct an investigation into the underlying facts." (internal citations omitted) (citing Trane Tr. 541, 546–47)).

[255] Fund LPA § 6.4F.

the other Property Partnership Interests.[256]  But Fund assets do not include Property

LP's assets or the Property Partnership's assets.[257]  Indeed, Fund GP is prohibited

from participating in Property management "except as required to exercise the rights

of the Fund under the Property Partnership Agreements."[258]  Compare the Property

Partnership, which was created "to develop, construct, *own*, maintain and operate"

Kate's Trace, and to "acquire the Land and to develop, finance, construct, *own*,

maintain, operate and sell or otherwise dispose of the Apartment Complex."[259]  Its

definition of "Apartment Complex" is Kate's Trace, as "owned and operated . . . by

the [Property] Partnership."[260]  The Property LPA also contains representations

about the Property's title and the Property Partnership's ownership of the

Property.[261]

---

[256] *Id.* at Art. I (defining "Intermediate Entity," "Property Partnership," and "Property Partnership Interests"); *id.* §§ 6.3A(i), (vii), (viii), (xii)–(xiv).

[257] *See id.* § 6.8E (indicating the Fund owns Property Partnership Interests "directly or indirectly through an Intermediate Entity," while the Property Partnership owns the Property).

[258] *Id.* § 6.3A(xxiv).

[259] Property LPA at HUDSON00018376 (emphasis added); *id.* § 3.01 (emphasis added); *id.* § 3.02 (granting the Property Partnership authority to "acquire" the land on which Kate's Trace is located, to "construct, operate, maintain, improve, buy, *own*, sell, convey, assign, mortgage, rent or lease any real estate and any personal property necessary to the operation of the Apartment Complex;" and to "maintain and operate the Apartment Complex" (emphasis added)).

[260] *Id.* at Art. II (defining "Apartment Complex").

[261] *Id.* §§ 4.01(e), (n).

The parties intentionally created a two-tier structure with an upper-level partnership (the Fund) to indirectly hold the Property Partnership Interests, a series of lower-level partnerships (the Approved Property Partnerships) to hold the LIHTC-eligible properties, and corresponding Intermediate Entities to connect the two levels.[262] "Delaware law respects corporate separateness."[263] The Property is an asset of the Property Partnership, in which Property LP holds an interest and over which Property GP has "full, complete and exclusive control."[264] Fund GP has neither the authority, nor the fiduciary duty, to interfere with the Property.[265]

Though the Property itself is not a Fund asset over which Fund GP owes a duty, DLE points out that the Property was the source of value for the Fund's Property Partnership Interests, and therefore contends Fund GP owed a duty to safeguard that value. DLE is correct, as far as Fund GP's duties go. Fund GP's sole duty is over the "safekeeping and use" of the Fund's assets "for the exclusive benefit of the Fund."[266] I conclude that duty toward "safekeeping and use" of the Property

---

[262] *See* First Amendment at HUDSON00018158; Macari Tr. 14.

[263] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at \*26 (Del. Ch. Nov. 17, 2014); *accord Allied Cap. Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006) ("[O]ur corporation law is largely built on the idea that the separate legal existence of corporate entities should be respected—even when those separate corporate entities are under common ownership and control.").

[264] Property LPA § 8.01(a).

[265] Fund LPA §§ 6.3A(xxiv), 6.4F.

[266] *Id.* §§ 6.4F, 6.4J.

Partnership Interest value contemplates preserving tax credit value but does not contemplate pursuing equity value after the Compliance Period. My conclusion is based on the plain text of Section 6.4F, and the Fund's purpose.

The key phrase of Section 6.4F—"safekeeping and use of all funds and assets of the Fund"—imposes a duty to guard, preserve, and distribute the Fund's presently held value, *i.e.*, tax benefits. Black's Law Dictionary defines "safekeeping" or "safeguarding" as "[t]he act of protecting something in one's custody; secure guardianship."[267] Black's Law Dictionary defines the noun "use" as "[t]he application or employment of something; esp[ecially], a long-continued possession and employment of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional."[268] The plain meaning of "safekeeping" and "use" in Section 6.4F imposes on Fund GP a fiduciary responsibility to preserve and continue to hold the Fund's existing assets in a manner consistent with their intended purpose as informed by the Fund LPA. I interpret Section 6.4F as charging Fund GP with the duty to safeguard the Fund's cash and value from tax credits in its possession, to prevent them from being, for example, commingled, abandoned, entrusted to a party or entity with a "negative reputation in the industry and repeated regulatory violations," or used for the benefit

---

[267] *Safekeeping*, *Black's Law Dictionary* (11th ed. 2019).

[268] *Use*, *Black's Law Dictionary* (11th ed. 2019).

71

of any entity other than the Fund.[269]  Section 6.4F's language does not impose a duty on Fund GP to maximize or chase new value.

Chasing value over and above tax credits is also inconsistent with the Fund's purpose, and therefore beyond the scope of Fund GP's authority and duty.  The Fund LPA provides that the Fund's purpose was to solicit investment in the Property and distribute tax credits from it, so long as those tax credits existed.[270]  Fund GP's investment authority is cabined to Property Partnership Interests in an entity that owns a Property that "is or is planned to be eligible for Tax Credits."[271]  After the Fund completed its exchange of capital for tax credits at the end of the Compliance Period, the parties understood that the Property would not generate additional tax credits or tax benefits, or any income at all.[272]  The forecast DLE created when it became an Investor Limited Partner did not project any Fund-level income or tax

[269] *See, e.g.*, *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1125, 1127–28 (Del. Ch. 2008) (finding defendant stated a counterclaim that the Managing Owner breached its fiduciary duty to "safekeep[] all funds and assets of the Trust and the use thereof for the benefit of the Trust" by engaging in a transaction with a counterparty with a "negative reputation in the industry and repeated regulatory violations"); *cf. In re Stull*, 985 A.2d 391 (Del. 2009) (TABLE) (finding the respondent violated his ethical duty to safeguard his client's funds by letting fiduciary accounts reach negative client balances and by commingling funds).

[270] Fund LPA § 2.3; *id.* at Art. I (defining "Approved Property Partnerships," "Property," "Property Partnership," "Property Partnership Interests," "Tax Credits," and "Units").

[271] *Id.* § 6.3A(xxi); *id.* at Art. I (defining "Property," "Property Partnership Interests," and "Tax Credits").

[272] JX004 at HUDSON00018773; JX011 at DLE_0005420; Fund LPA § 3.3A(ii); Trane Tr. 520.

benefits from the Property after the Compliance Period.[273] DLE's own forecasts and Hunt's contemporaneous internal documents belie DLE's present quest for value other than tax credits.[274]

The Fund succeeded: DLE and Fund LP received "materially all" projected tax credits and benefits from the Property, and the Property received the Fund investors' capital.[275] After the Compliance Period, when the Fund's model of syndicating investment in exchange for tax credits had sunset, Fund GP's decision to stick with that model is consistent with its authority, obligations, and duties.[276] Disposing of the Property by transferring it to a Designated Nonprofit at the end of

---

[273] JX011 at DLE_0005420; Trane Tr. 520.

[274] *Compare* D.I. 165 at 2, 49, *and* Trane Tr. 510–14, *and* Chiusano Tr. 394, *and* D.I. 184 at 6–7, 49, *and* D.I. 188 at 31, *with* JX011 at DLE_0005420, *and* Trane Tr. 520–22, *and* JX037 at DLE_0004085, *and* JX058 at DLE_0002308, *and* JX089 at DLE_0001819, *and* Chiusano Tr. 390, 392–94; 400–01, 405–06, 410–11.

[275] Trane Tr. 522; Macari Tr. 33, 87; PTO ¶ 41.

[276] *Cincinnati Bell*, 1996 WL 506906, at *13; *Kan. RSA 15*, 1995 WL 106514, at *2; *see also Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *31 (Del. Ch. May 8, 2015) (finding even if a principal disagrees with her agent's adherence to a business plan, "[d]emonstrating that a business plan or system has failed is not the same as demonstrating an actionable breach of fiduciary duty"), *aff'd sub nom. Ironworkers Dist. Council of Phila. v. Andreotti*, 132 A.3d 748 (Del. 2016). While a federal court applying California law recently held that a fund general partner breached its fiduciary duties in connection with a disposition, the reasoning of that case is not rooted in Delaware fiduciary jurisprudence. *See Centerline II*, 2022 WL 247951, at *8.

the Compliance Period for the Section 42 price is consistent with the Fund's purpose.[277]

Challenging that Disposition, as DLE demands, is beyond the scope of, and inconsistent with, the Fund's purpose and Fund GP's authority. The Fund LPA did not authorize Fund GP to invest in properties that were not eligible for tax credits.[278] More broadly, Fund GP cannot bind the Fund with an act that is not in furtherance of the Fund's business "in the usual way."[279] Challenging a Section 42 ROFR disposition is not in the "usual way" or "ordinary course" of this, or any, LIHTC

---

[277] Fund LPA § 2.3; *id.* § 10.3F (requiring Fund GP to provide Property financial reports to the Investor Limited Partners only through the end of the Compliance Period); Property LPA § 8.02(c) (describing the "Purchase Price") (citing 26 U.S.C. § 42(i)(7)); *id.* at Art. II (defining "Projected Credit" and projecting tax credits through 2015); *id.* § 4.01(q) (projecting tax credits through 2015); *id.* § 4.01(z) (representing to Property partners, including Property LP, that "the General Partner shall at no time develop the Apartment Complex or manage the Partnership which is not consistent with the award of points assigned by the Agency to the Partnership's Low Income Housing Tax Credit Application for Reservation, except with the prior approval of the Agency and the Special Limited Partner"); *id.* § 4.02(d) (imposing on Property GP the duty to "take no action with respect to the business and property of the Partnership which is not reasonably related to the achievement of the purpose of the Partnership"); *accord id.* § 8.01(a) (same); *id.* § 8.03 (same).

[278] Fund LPA § 6.3A(xxi); *id.* at Art. I (defining "Property," "Property Partnership Interests," and "Tax Credits").

[279] *Abt*, 1992 WL 380615, at *3 (quoting 6 *Del. C.* § 1509(b) (repealed by the 1999 Delaware Revised Uniform Partnership Act and reappearing in 6 *Del. C.* § 15–301(2))); 6 *Del. C.* § 15–301(2); *Rudnitsky*, 2000 WL 1724234, at *5 ("[A] partner has authority to bind the partnership only with respect to acts the partner performs within the ordinary course of the partnership business."); *Cincinnati Bell*, 1996 WL 506906, at *13; DELAWARE LIMITED PARTNERSHIPS § 4.16 at 4-35.

partnership.[280]  Stopping, reversing, or rescinding the Disposition would be outside of the "usual way."  The Property has already distributed its allocated tax credits,[281] so retaining investments in a property that is no longer eligible because a limited partner "believes it would be in its own strategic business interest to do so" would not be "the usual way."[282]  After the Compliance Period expired and the Property was no longer eligible for tax credits, pursuing other sources of value from the Property was not part of the Fund's purpose.  Fund GP did not have the authority to challenge the Disposition.[283]

And so, Fund GP did not owe a duty to challenge the Disposition.  Fund GP's fiduciary duties do not extend to the Property itself because the Property is a Property Partnership asset, not a Fund asset, over which the Fund LPA precludes Fund GP from exercising plenary authority.[284]  And while the Property is the source of tax benefits and credits for the Property Partnership Interests, Fund GP does not have a

---

[280] *See Rudnitsky*, 2000 WL 1724234, at *6 ("In determining what is 'carrying on in the usual way' or 'ordinary course,' of a partnership's business, the Court may consider the partnership's stated purposes, the precedent set by the partnership's prior 'custom or course of dealing' and 'the general custom' of analogous partnerships." (citations omitted)).

[281] Trane Tr. 522; Macari Tr. 13, 33, 87; PTO ¶ 41.

[282] *Cincinnati Bell*, 1996 WL 506906, at *13.

[283] Further, Fund GP would have needed Fund LP's consent to participate in the Disposition or initiate any lawsuit.  Fund LPA §§ 6.3A(v), (xxiv); Macari Tr. 87.

[284] Fund LPA §§ 6.3A(xxiv), 6.4F.

duty to squeeze that Property for post-Compliance Period value.[285] Neither the Fund LPA nor the Fund's purpose contemplate such a duty.

This is so even if limited partner DLE disagrees with the Fund's purpose, goals, or the timing of executing those.[286] As this Court held in *Cincinnati Bell*, a general partner's duty and "responsibility is to manage the Partnership in accordance with" the "Partnership's purpose as expressed in the Partnership Agreement," and so the general partner "is under no fiduciary obligation to abandon that purpose and [take contrary action] because one limited partner. . . believes it would be in [the limited partner's] own strategic business interest to do so."[287] Fund GP does not owe DLE any duty to pursue DLE's goal of obtaining fair market value for the Property, because that goal exceeds and diverges from the Fund's purpose. It also does not have a duty to use its cash, in a manner other than "for the exclusive benefit of the

---

[285] *Cf. Cincinnati Bell*, 1996 WL 506906, at *5 (declining to incorporate "profit" as the purpose of a partnership where the limited partnership agreement does not include evidence that the partnership's purpose is to "generate economic returns" or any measure of performance); *id.* at *13 ("Ameritech's responsibility is to manage the Partnership in accordance with its purpose of establishing and providing cellular services in the Cincinnati, Columbus and Dayton region. Ameritech is under no fiduciary obligation to abandon that purpose and sell the business because one limited partner—Cincinnati Bell— believes it would be in its own strategic business interest to do so.").

[286] JX114 at HUDSON00013635; *see Cincinnati Bell*, 1996 WL 506906, at *13 ("If a partner does not share Ameritech's vision of the Partnership's viability in the cellular market, that partner retains the right under the Partnership Agreement to cash out its interest in the Partnership or to withdraw from the Partnership.").

[287] *Cincinnati Bell*, 1996 WL 506906, at *13.

Fund," to interfere with the Disposition simply because DLE "believes it would be in its own strategic business interest to do so."[288]  A fiduciary cannot breach a duty it does not owe.[289]

And so, because Fund GP did not breach any fiduciary duties in connection with the Disposition, DLE lacked Cause to remove Fund GP as General Partner under the Fund LPA.  The Default Notice purported to remove Fund GP for Cause under Section 7.2A(ii) for "breach of fiduciary duty in the performance of [Fund GP's] duties and obligations as General Partner under [the Fund LPA], or any act outside the scope of [Fund GP's] duties and obligations as General Partner pursuant to [the Fund LPA] that has a material adverse effect on the Fund."[290]  With respect to Counts I and II and Counterclaim Counts I, II, and III, I conclude Fund GP did not breach its fiduciary duties by failing to challenge the Disposition because it did not owe a duty to do so.  Accordingly, DLE did not have Cause to remove Fund GP as general partner of the Fund under Fund LPA Section 7.2A(ii), and the Default Notice is invalid due to the lack of Cause under that section.

---

[288] Fund LPA § 6.4F; *Cincinnati Bell*, 1996 WL 506906, at *13.

[289] *See Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1024–25 (Del. Ch. 2010) (finding no breach where "the Holdings LP Agreement eliminates all fiduciary duties").

[290] Fund LPA § 7.2A(ii).

### C. DLE Failed To Demonstrate Cause For Removal Under Fund LPA § 7.2A(iii) Because DLE Failed To Prove Fund GP Breached The Fund LPA.

DLE's Counterclaim Counts I and V assert Fund GP breached the Fund LPA.[291] The Fund LPA is governed by Delaware law.[292] Under Delaware law, the elements of a breach of contract claim are (i) a contractual obligation, (ii) a breach of that obligation by the contractual party; and (iii) causally related harm to the counterparty.[293] It is undisputed the Fund LPA is a "valid and enforceable written contract."[294]

"To determine the scope of a contractual obligation, 'the role of a court is to effectuate the parties' intent.'"[295] "To determine what contractual parties intended, Delaware courts start with the text."[296] In doing so, the Court aims to "give priority to the parties' intentions as reflected in the four corners of the agreement, construing

---

[291] Countercl. ¶¶ 106, 129–35.

[292] PTO ¶¶ 2, 18; Fund LPA § 13.2.

[293] *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2021 WL 5267734, at *51 (Del. Ch. Nov. 12, 2021) (citing *WaveDivision Hldgs. v. Millennium Digit. Media Sys., L.L.C.*, 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010)).

[294] Countercl. ¶ 130; D.I. 44, Plaintiffs' Reply to DLE Investors, LP's Verified Counterclaim Against JER Hudson GP XI LLC and Nominally Against Hudson Housing Tax Credit Fund XXI, LP, ¶ 130.

[295] *Bandera*, 2021 WL 5267734, at *51 (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)).

[296] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

the agreement as a whole and giving effect to all its provisions."[297]  "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[298]  A written agreement is plain and clear on its face "[w]hen the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation."[299]  When an agreement is plain and clear, the Court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[300]  "Delaware adheres to the objective theory of contracts, [meaning that] a contract's construction should be that which would be understood by an objective, reasonable third party."[301]  "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[302]

---

[297] *Salamone*, 106 A.3d at 368 (internal quotation marks omitted) (quoting *GMG Cap. Inv., LLC. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[298] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[299] *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008).

[300] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotations omitted) (quoting *Salamone*, 106 A.3d at 368).

[301] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (footnotes and internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[302] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

### 1. Fund GP Did Not Breach Fund LPA Section 6.8D Because It Did Not Owe A Contractual Duty Under That Section.

DLE claims Fund GP breached its contractual obligations under Fund LPA Section 6.8D, which explains the fees to be paid to Fund GP for its management services.[303] Section 6.8D states, in pertinent part:

> After all other expenses of the Fund are paid, the Fund shall pay to the General Partner or an Affiliate of the General Partner designated by the General Partner an annual fee (the "Asset Management Fee") for services in connection with the oversight of the performance of the Approved Property Partnerships and the compliance by the Property General Partners and managing agents thereof with the provisions of the Property Partnership Agreements, management agreements, regulatory agreements and applicable laws.[304]

DLE asserts this section imposes on Fund GP a duty to "ensure [] Property GP took all actions [required] of it [] under the Property LPA;" that Fund GP breached that duty because Property GP did not seek "Consent from [] Property SLP and ultimately the Fund" in advance of the Disposition;[305] and that this breach supports Fund GP's removal as general partner.

---

[303] Countercl. ¶¶ 39–46; D.I. 165 at 49 ("The Fund GP also breached other provisions of the Fund LPA, namely (1) the prohibition on giving consent of the Fund to the sale of the Apartment Complex without the consent of DLE (Sections 6.3A(ii) and 6.9A), and (2) the duty to ensure that the Property GP and its managing agent ([the Developer]) comply with the terms of the Property Partnership LPA (Section 6.8D)."); D.I. 184 at 33; D.I. 188 at 5.

[304] Fund LPA § 6.8D; *id.* § 6.8 ("Certain Payments").

[305] D.I. 184 at 33.

As an initial matter, it is not clear that any Fund GP breach of Section 6.8D could justify Fund GP's removal as general partner under Sections 7.2A(ii) and (iii). Fees paid under Section 6.8D are paid to the general partner "other than in its capacity as a partner of the Fund."[306]

That issue aside, Section 6.8D simply does not impose any duties on Fund GP that could support a breach. The plain meaning of Section 6.8D imposes a duty on the Fund to pay the Asset Management Fee for Fund GP's services, but does not itself impose any oversight obligation on Fund GP. Specifically, it does not impose a duty on Fund GP to ensure Property GP complies with the Property LPA. Section 6.8D's mandatory directive language is directed at the Fund, not Fund GP.[307] The fee is calculated by, and payable upon, the Fund's receipt of Property Partnership Interests and capital contributions—not Fund GP's performance of any particular services or oversight.[308] In context, Section 6.8D lists the management fee among other Section 6.8 fees ("Certain Payments") to be paid to the General

---

[306] Fund LPA § 6.8F.

[307] *See id.* § 6.8D ("After all other expenses of the Fund are paid, *the Fund shall pay to the General Partner* . . . an annual fee (the 'Asset Management Fee') for services. . . .") (emphasis added); *see also id.* ("*The obligation of the Fund to pay the Asset Management Fee* with respect to a given Approved Property Partnership shall begin to accrue on the date the Fund acquires the Property Partnership Interest with respect to such Approved Property Partnership.") (emphasis added).

[308] *Id.*; *see Tygon Peak Cap. Mgm't, LLC v. Mobile Invs. Investco, LLC*, 2022 WL 34688, at *15–16 (Del. Ch. Jan. 4, 2022) (finding a provision compelling the payment of a fixed annual management fee not to be contingent on the counterparty's performance of its duties).

Partner, including Organization and Offering Expense Reimbursement, an Acquisition Fee, a Disposition Fee, compensation for providing financing, and construction oversight fees.[309] Section 6.8D also prioritizes the management fee "[a]fter all other expenses of the Fund are paid," and quantifies it.[310] In contrast, Fund GP's duties are described in Section 6.4.[311] I conclude the language in Section 6.8D that DLE relies on describes Fund GP's role as syndicator and fund manager, but itself imposes no duty. Once again, Fund GP cannot breach a duty it does not owe: Fund GP cannot have breached Section 6.8D.[312]

### 2. Fund GP Did Not Breach Any Consent Provisions.

DLE asserts a broad claim that the Fund LPA obligated Fund GP to obtain the Fund's limited partners' consent to the Disposition, and Fund GP's failure to do so breached the Fund LPA and therefore warrants Fund GP's removal.[313] DLE has

---

[309] Fund LPA §§ 6.8B–C, E, G–H.

[310] *Id.* § 6.8D.

[311] *Id.* § 6.4 ("Duties and Obligations of the General Partner").

[312] *See, e.g.*, *Brown v. Dover Downs, Inc.*, 2011 WL 3907536, at *4 n.38 (Del. Super. Aug. 30, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012); *Lonergan*, 5 A.3d at 1024–25 (finding no breach where the limited partnership agreement "eliminate[d] all fiduciary duties" because the defendant did not owe a duty).

[313] *See, e.g.*, Countercl. ¶¶ 50–51, 56–58, 64–66; D.I. 165 at 4, 29, 49; D.I. 184 at 36–37. DLE also argued its lack of consent, or outright resistance, to the Disposition means the Property Partnership was not a "willing seller" as necessary to implement the ROFR. While this argument has been a central feature of other LIHTC suits brought by new limited partners, *see supra* note 83, it is not dispositive here and so I do not reach it.

failed to consistently specify which provisions Fund GP breached by not seeking DLE's consent.[314] Contemporaneous documents and trial testimony prove DLE understood its consent was not needed if the Property "GP goes through the ROFR process outlined in the agreement."[315] DLE's belief that the Fund LPA requires its consent to the Disposition appears to have been inspired by litigation. All the same, I have reviewed the Fund LPA and conclude Fund GP did not breach any of its consent provisions.

The Fund LPA and Property LPA contain nested consent requirements that mention a sale or disposition of the Property, but none require DLE's consent for the Disposition. Explaining why requires stepping through first the Fund LPA and then the Property LPA; nothing in the Fund LPA required DLE's consent, and the Property LPA affirmatively granted Property GP the authority to appoint a nonprofit to hold and exercise a Section 42 ROFR.

---

[314] DLE has variously alleged Fund GP breached Fund LPA Sections 6.3, 6.3A(ii), 6.3B(viii), and 6.9A. *See, e.g.*, JX218 at HUDSON00008228; D.I. 165 at 49; D.I. 184 at 35–37. Other times, like in Counterclaim Count V, it has failed to point to a specific Fund LPA section. *See, e.g.*, Countercl. ¶¶ 129–35; D.I. 184 at 33 (failing to point to a Fund LPA section when arguing Fund GP "ignored" Property GP's alleged breaches of the Property LPA, which DLE argues "it itself a material breach").

[315] JX074 at DLE_0002593; JX088 ("[Property] GP has right to go through ROFR process without our approval"); Chiusano Tr. 406–07 (confirming his July 2020 understanding that DLE's consent was not required).

DLE objected to the admissibility of JX074 in a footnote in its post-trial answering brief. D.I. 188 at 31 n.10. DLE failed to object to JX074 on the Joint Exhibit List. D.I. 169 at 5. DLE's objection to JX074 is waived. D.I. 163 at 39; Trial Tr. 89.

I begin with the Fund LPA. Section 6.3A lists several actions by the General Partner requiring "the Consent of the Investor Limited Partner." As a reminder, under the Fund LPA, Fund LP can give Consent of the Investor Limited Partners without DLE, but DLE can never, alone, give that Consent.[316] Turning to the items requiring such Consent, Fund LPA Sections 6.3A(ii) and (xxiv) are relevant here:

---

[316] First Amendment at HUDSON00018162–63; Fund LPA § 12.2; Chiusano Tr. 389–90.

Without the Consent of the Investor Limited Partners, but subject to Section 6.3.B hereof, the General Partner shall not:[317]

. . .

(ii) [] give the consent of the Fund or an Intermediate Entity in its capacity as a partner of a Property Partnership to any action proposed to be taken by such Property Partnership or the Property General Partner which, under the provisions of its Property Partnership Agreement, requires the consent of an Intermediate Entity or the Fund as a partner; or to take or cause [Property SLP] to take any action that is permitted to be taken by the Fund, the applicable Intermediate Entity or [Property SLP] under such Property Partnership Agreement;[318]

. . .

(xxiv) manage and operate the Fund as an operating company or cause the Fund to participate in the development, leasing, operation or disposition of a Property, except as required to exercise the rights of the Fund under the Property Partnership Agreements[.]"[319]

In so many words, these sections require the Investor Limited Partners' Consent, subject to Section 6.3B, for Fund GP to: give the consent of Property LP at the Property Partnership level; take action through Property SLP at the Property

---

[317] First Amendment at HUDSON00018167 ("The first clause of [Initial Fund LPA] Section 6.3A is hereby deleted in its entirety, and amended to read in full as follows: 'A. Without the Consent of the Invested Limited Partners, but subject to Section 6.3.B hereof, the General Partner shall not:'").

[318] Fund LPA § 6.3A(ii); First Amendment at HUDSON00018167–69 (amending the Initial Fund LPA to add Section 6.3B); Fund LPA at Art. I (providing the "Special Limited Partner" is Property SLP).

[319] Fund LPA § 6.3A(xxiv).

Partnership level; or interfere with the operation and management or disposition of the Property.[320]

Section 6.3B(viii) in turn provides:

Notwithstanding any provision herein to the contrary, without the Supermajority Consent of the Investor Limited Partners, the General Partner shall not: . . . (viii) cause the Fund to sell, transfer or assign the Fund's interest in any Intermediate Entity [Property LP] *or give the consent of the Fund or an Intermediate Entity [Property LP], in its capacity as a partner of a Property Partnership, to the sale of a Property or a Property Partnership Interest*[.][321]

Again, Investor Limited Partners' Supermajority Consent requires DLE's consent to reach over sixty-six percent of those limited partner interests.[322]

The Disposition did not trigger Fund LPA Section 6.3B(viii)'s Supermajority Consent requirement. The Disposition did not transfer the Fund's interest in

---

[320] In keeping with Section 6.3A(ii), Fund LPA Section 6.9A reiterates the requirement for Investor Limited Partner Consent for any action by the Property SLP:

[Property SLP] shall not take any action or exercise any consent, voting or other rights pursuant to a Property Partnership Agreement of any Property Partnership without the Consent of the Investor Limited Partner[s]. The Investor Limited Partner shall have the right to cause [Property SLP] to take any action or exercise any consent, voting o[r] other rights pursuant to the Property Partnership Agreement of any Property Partnership.

Fund LPA § 6.9A; First Amendment at HUDSON00018162.

As explained, Fund GP does not have the authority or duty to interfere with the Disposition because doing so is contrary to the Fund's purpose. One reading of Section 6.3A(xxiv) crystallizes this, requiring the Investor Limited Partners' affirmative consent before Fund GP has authority to interfere with the Disposition. *Id.* § 6.3A(xxiv).

[321] First Amendment at HUDSON00018168 (emphasis added).

[322] *Id.* at HUDSON00018163.

Property LP or the Property Partnership Interests. And Fund GP did not give Fund or Property LP consent to the Disposition. Property GP did not seek consent from Fund GP, the Fund's Investor Limited Partners, Property LP, or Property SLP in connection with the Disposition.[323] It did not have to under the Property LPA.[324]

I turn to the Property LPA to explain why that is so. Article VIII of the Property LPA sets forth Property GP's authority and constraints thereof. Section 8.01(a) grants Property GP "full, complete and exclusive discretion" to exercise the authority granted to it "[e]xcept as otherwise set forth in" the Property LPA.[325] Section 8.02(a) enumerates five actions Property GP cannot take, and Section 8.02(b) enumerates fourteen actions Property GP cannot take without Property SLP's consent, including "sell or otherwise dispose of, at any time, all or substantially all of the assets of the [Property Partnership]."[326] And then Section 8.02(e) addresses a Section 42 disposition:

---

[323] Macari Tr. 85–86, 150; PTO ¶¶ 52–54.

[324] Again, contemporaneous documents show DLE's management did not believe its consent was required at the time. JX088 ("[Property] GP has right to go through ROFR process without our approval"); Chiusano Tr. 406–07 (confirming that understanding).

[325] Property LPA § 8.01(a).

[326] *Id.* §§ 8.02(a), (b), (b)(i).

Notwithstanding anything to the contrary contained herein, commencing on the fifteenth (15th) anniversary of the first day of the first taxable year of the applicable Tax Credit compliance period, the [Property] General Partner shall have the right to designate a 'qualified non-profit organization' at that time, as having the right of first refusal to purchase the [Property] subject to the Extended Use Agreement for the minimum price established in accordance with Section 42(i)(7) of the Code, plus any outstanding amounts owed to the [Property SLP] and [Property LP] pursuant to this [Property LPA] including any federal income tax liability incurred by the Limited Partners as a result of the payment of amounts pursuant to this clause.[327]

DLE's position at trial, that Property GP had to seek consent for the Disposition that in turn triggered the Fund LPA's Supermajority Consent provision, hinges on the interplay between Property LPA Sections 8.02(e) and 8.02(b). DLE contends Section 8.02(e) is still subject to Section 8.02(b)'s consent requirement, and that Section 8.02(e) does not encompass a final ROFR disposition. Plaintiffs argue Section 8.02(e) controls entirely, permitting Property GP to designate a nonprofit to hold and exercise the ROFR. I conclude Section 8.02(e)'s specific enabling language, independent from and "notwithstanding" Section 8.02(b)'s broader consent requirements, authorizes Property GP to appoint a designated nonprofit to hold and exercise a Section 42 ROFR without Property SLP's consent.[328]

---

[327] *Id.* § 8.02(e).

[328] The Supreme Judicial Court of Massachusetts construed a similar set of provisions the same way. *See Homeowner's Rehab*, 99 N.E.3d at 760 ("As stated, the partnership agreement confers broad powers on the general partner, while circumscribing the powers of the limited partners. The partnership agreement identifies only a few actions that the

Resolving this dispute over the interpretation of the Property LPA requires construing it in accordance with the laws of the Commonwealth of Virginia.[329] Virginia law construes contracts "as a whole, giving terms their ordinary meaning unless some other meaning is apparent from the context."[330] "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares."[331]

---

general partner cannot take without the consent of the special limited partner. Of relevance here, section 5.5.B(iv) prohibits the general partner from 'sell[ing] all or any portion' of the property, 'except with the Consent of the Special Limited Partner.' This prohibition is 'subject to the provisions contained in Section 5.4,' which grant the general partner the authority to sell "all or substantially all of the assets of the Partnership; provided, however, that except for a sale pursuant to the Option Agreement, the terms of any such sale . . . must receive the Consent of the Special Limited Partner before such transaction shall be binding on the Partnership.' The limited partners concede that, under section 5.4, the special limited partner need not consent to the terms of a sale if the sale is pursuant to the option agreement, for example where the nonprofit developer has exercised its right of first refusal.").

[329] Property LPA at HUDSON00018376; Va. Code Ann. § 50-73.84(b) (West) ("The law of this Commonwealth shall govern relations among the partners and between the partners and the partnership, and the liability of partners for debts, obligations and liabilities chargeable to the partnership, in a partnership that has filed a statement of registration as a registered limited liability partnership in this Commonwealth.").

[330] *Schuiling v. Harris*, 747 S.E.2d 833, 836 (Va. 2013) (citing *Virginian Ry. Co. v. Hood*, 146 S.E. 284, 285 (Va. 1929)).

[331] *Id.* at 836 (quotation marks and citation omitted) (quoting *Wilson v. Holyfield*, 313 S.E.2d 396, 398 (1984)).

The parties dispute the meaning and effect of Section 8.02(e)'s first clause, which begins: "Notwithstanding anything to the contrary contained herein . . . ."[332] DLE contends the word "herein" means the clause applies only to the same paragraph Section 8.02(e), thereby preserving Section 8.02(b)'s consent requirements for the ROFR exercise.[333] DLE contends "herein" is narrower than other language that could have been chosen, like "[n]otwithstanding anything to the contrary contained in this Agreement."[334] Alternatively, DLE argues the prefatory clause is ambiguous and so, citing Delaware law, any inference must be drawn in DLE's favor.[335] Plaintiffs argue Section 8.02(e)'s "notwithstanding" clause "applies not only to the *granting* of a Section 42 ROFR, but also to its *exercise*."[336] Virginia law supports Plaintiffs' interpretation: I conclude "herein" refers to Article VIII and not merely Section 8.02(e).

---

[332] Property LPA § 8.02(e).

[333] Post-Trial Tr. 81–82.

[334] *Id.* 82 (internal quotation marks omitted) (citing *Tygon Peak*, 2022 WL 34688, at *17); *id.* 105 (citing Property LPA § 7.07).

[335] D.I. 184 at 4, 38 (citing *Bandera*, 2021 WL 5267734, at *71); D.I. 188 at 27, 30. This interpretation would be contrary to Property LPA Section 15.10 which provides: "[A]ny rule of law or legal decisions that would require interpretation of any ambiguity in this Agreement against the party that has drafted it shall not apply and are hereby waived." Property LPA § 15.10. "A contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." *TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002). Elsewhere, DLE has affirmed "[t]he plain language of the Partnership Agreements is not ambiguous and constitutes the best evidence of the parties' intent." D.I. 184 at 12.

[336] D.I. 185 at 9; D.I. 189 at 36.

I find these provisions of the Property LPA are unambiguous and so, I construe them according to their plain meaning.[337]  Applying Virginia law, I cannot treat any word or phrase as meaningless if a reasonable meaning can be given to it.[338]  Virginia law also gives specific guidance on interpreting "notwithstanding anything to the contrary" clause:  courts must locate a contrary provision or provisions to give meaning to the clause.  In *Shepherd v. Davis*, the Virginia Supreme Court interpreted a lease agreement granting the lessee both a fixed-price purchase option and a right of first refusal.[339]  The lessee attempted to invoke the fixed-price option instead of exercising its right of first refusal, so the Virginia Supreme Court considered *de novo* whether the right of first refusal "overr[o]de" the fixed-price option.[340]  The right of first refusal provision contained prefatory language:  "Notwithstanding anything contained in this Agreement to the contrary . . . ."[341]  Giving that unambiguous language its plain and ordinary meaning, the court found:

---

[337] *See Golding v. Floyd,* 539 S.E.2d 735, 736 (Va. 2001).

[338] *See Dominion Savings Bank, FSB v. Costello*, 512 S.E.2d 564, 567 (Va. 1999).

[339] 574 S.E.2d 514, 516 (Va. 2003).

[340] *Id.* at 516–18; *id.* at 519 ("[W]e are not bound by a chancellor's interpretation of a contract because we have the same opportunity as the chancellor to consider the contract language.").

[341] *Id.* at 517.

[T]he prefatory language modifies the fixed-price option and gives the right of first refusal precedence. The fixed-price option is the only provision in the lease that, by its terms, is "contrary" to Shepherd's right of first refusal. We agree with the Davises' argument that "the use of the term 'contrary' suggests the terms being overridden are not complementary." The phrase "notwithstanding anything to the contrary" means irrespective of the fixed-price option. To read this phrase as Shepherd suggests would render meaningless not only the prefatory language but also two other sentences found in Paragraph 23.11, which created the right of first refusal.[342]

With this guidance, I look for contrary terms in the Property LPA to give Section 8.02(e)'s "notwithstanding" clause meaning. There is nothing contrary to Section 8.02(e) within Section 8.02(e) itself. To have meaning, "herein" must mean something broader. One need not look far: Article VIII offers a contrary term in Section 8.02(b)'s consent requirement.

This broader meaning is consistent with how the Property LPA uses "notwithstanding" clauses. The Property LPA uses "[n]otwithstanding anything to the contrary contained herein" seven times, "[n]otwithstanding the forgoing" three times, "[n]otwithstanding any provisions set forth herein" once, and "[n]otwithstanding any other provision of this Agreement" once.[343] In reading the Property LPA as a whole and interpreting terms within the context in which they are

---

[342] *Id.* at 520 (alterations omitted).

[343] *Compare* Property LPA §§ 4.01(l)(i), 5.01(c)(iii), 8.01(b), 8.02(e), 8.08(c), 12.03, 15.06, *with id.* §§ 8.02(c), 8.12(b), 12.07(e), *and id.* § 4.02(t), *and id.* § 7.07(a). Section 11.02(b) includes the phrase "notwithstanding the provisions of Sections 7.02 and 7.04." *Id.* § 11.02(b).

used,[344] I find the drafters wrote "notwithstanding the forgoing" to refer to the paragraph or subsection in which the proviso is found;[345] wrote "notwithstanding any other provision of this Agreement" to mean what it says;[346] and wrote "notwithstanding anything to the contrary contained herein" to refer to something in between, and at a minimum the article in which the provision appears.[347] In the specific context of Section 8.02(e), I find "herein" means Article VIII, in which Section 8.02(b)'s contrary consent requirement is found. Accordingly, I conclude Section 8.02(e) authorizes Property GP to designate a nonprofit to hold the ROFR, notwithstanding Section 8.02(b)'s consent requirement. This is consistent with the

---

[344] *See Schuiling*, 747 S.E.2d at 836 (citing *Virginian Ry.*, 146 S.E. at 285).

[345] Property LPA § 8.02(c) (notwithstanding Property GP's option, also in Section 8.02(c), Property SLP may request a "Continued Compliance Sale" or a sale after the submission of a "Qualified Contract"); *id.* § 8.12(b) (requiring Property SLP to give "Notice . . . of its determination that the General Partner shall be removed" unless, "the event giving rise to [that] determination" arises under Sections 8.12(a)(ii)(G)–(I), "then there shall be no requirement for Notice"); *id.* § 12.07(e) (stating the Property Partnership "shall indemnify and reimburse the Tax Matters Partner . . . . Notwithstanding the foregoing, the provisions on liability and indemnification of the General Partner set forth in Section 8.07 . . . shall be fully applicable to the Tax Matters Partner").

[346] *Id.* § 7.07(a).

[347] *E.g.*, *id.* § 4.01(l)(i) (stating "procurement of . . . public and general liability insurance must be completed no later than February 8th, 2004" notwithstanding when closing occurs, contrary to Section 4.01(e)'s requirement to obtain title insurance before closing); *see also* *id.* § 4.02(t) (stating that Property GP "shall not alter or permit [any person] to alter" the Property in a way "which would increase [Property GP's] responsibilities for compliance with the Access Laws without prior written approval of" Property SLP, notwithstanding Section 8.02(b)(i) which permits alterations to the Property under $50,000 without Property SLP's consent and does not require Property SLP's consent to be written).

Property LPA's grant of general partner authority, which is plenary "[e]xcept as otherwise set forth in" the Property LPA.[348]

Having concluded that Section 8.02(e)'s grant of authority is "notwithstanding" Section 8.02(b)'s consent requirement, the next task is to determine the scope of that grant of authority. Upon a designation, Section 8.02(e) bakes in the timing and price of the disposition, to be no sooner than "on the fifteenth (15th) anniversary of the first day of the first taxable year of the applicable Tax Credit compliance period," at the "minimum price established in accordance with Section 42(i)(7) of the Code."[349] And it describes "payment of amounts pursuant to this clause," which can logically only occur upon an exercise of the ROFR and subsequent disposition. The clause "notwithstanding anything to the contrary" also requires including a disposition in Section 8.02(e)'s grant of authority; limiting Section 8.02(e) to a designation alone would mean Section 8.02(b)'s consent requirement would still apply to a disposition, such that nothing in the Property LPA would be "contrary" to Section 8.02(e) and the "notwithstanding" clause would be meaningless. The ROFR's exercise and disposition must also be "notwithstanding" Section 8.02(b)'s consent requirement.[350] Finally, Virginia law requires interpreting

---

[348] Property LPA § 8.01(a).

[349] *Id.* § 8.02(e) (citing 26 U.S.C. § 42(i)(7)).

[350] *Id.*

a right of first refusal in consideration of its purpose to benefit the party who has the right of first refusal, here the Designated Nonprofit.[351] That principle supports an efficient designation and disposition under the Property GP's singular authority.

And so, I conclude Section 8.02(e) grants Property GP authority to unilaterally designate a nonprofit to hold a Section 42 ROFR, which can then exercise that ROFR in a disposition. Section 8.02(b)'s consent requirements do not apply to Property GP's designation of a Section 42 ROFR, or to the exercise of or disposition under that ROFR. That means the Fund LPA's consent requirements, specifically Sections 6.3A(ii) and 6.3B(viii), are not triggered by a Property LPA ROFR designation. Property GP had the authority to dispose of the Property to the Designated Nonprofit under Section 8.02(e) without Consent from Property SLP, Fund GP, or Fund LP, and without Supermajority Consent from DLE.

In conclusion, DLE has not demonstrated that Fund GP breached any Fund LPA consent provision. Therefore, DLE has not demonstrated that Fund GP violated the Fund LPA "in any material respect," as is required to constitute Cause for removal under Section 7.2A(iii). With respect to Counts I and II and Counterclaim

---

[351] *See Cities Serv. Oil Co. v. Estes*, 155 S.E.2d 59, 63 (Va. 1967) ("Since a right of first refusal is inserted in a lease for the benefit of the lessee, we must interpret it with that purpose in mind." (citing *First Nat. Exch. Bank v. Roanoke Oil Co.*, 192 S.E. 764, 770 (Va. 1937))).

Counts I and V, I find: (i) Fund GP did not breach any contractual duties;[352] (ii) the Default Notice is invalid as to Fund LPA Section 7.2A(iii); and (iii) DLE did not have Cause to remove Fund GP as general partner of the Fund under Fund LPA Section 7.2A(iii).

### D. Fund GP Is Not Liable For Breaches That Do Not Have A Material Adverse Effect On The Fund.

DLE not only seeks declaratory judgments seeking removal of Fund GP, but also asserts breach claims seeking to hold Fund GP liable. As explained, Fund GP has not breached the Fund LPA or its fiduciary duties. Further, liability is precluded by the Fund LPA's limitation of liability provision.

Fund LPA Section 6.7A, Limitation on Liability of General Partner, requires that any breach of fiduciary duty or breach of contract have a material adverse effect on the Fund in order for Fund GP to be liable.[353] Fund GP would only be liable to DLE for a breach if the breach materially affects the entire Fund. This is a high

---

[352] While DLE has alleged a breach of Section 6.4F as a breach of contract, and a potential Cause for removal under Section 7.2A(iii), this opinion treats the claim as a breach of fiduciary duty.

[353] Fund LPA § 6.7A. Plaintiffs raised Section 6.7A once in their Complaint and once in their pretrial brief. Compl. ¶ 36; D.I. 168 at 9. While the parties did not focus on this limitation of liability, I must read the Fund LPA as a whole. *See Salamone*, 106 A.3d at 368; *E.I. du Pont*, 498 A.2d at 1113; *see also In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 219–20, 249 (Del. Ch. 2014) (explaining that the Court considered exculpation even though the parties "did not ask the court to rule on the availability of exculpation").

bar.[354]   As the claimant, DLE bears the burden to prove that Fund GP is not exculpated.[355]  DLE has wholly failed to brief this element of its liability case.

At the risk of straying from my task, I will share that I do not believe that a failure to sue over an improperly exercised ROFR can cause a material adverse effect on the Fund after the Compliance Period.  As explained, Fund GP's duties to safeguard the funds and assets of the Fund encompass the Property Partnership Interests and cash reserves, but not the Property itself.[356]  As explained, Fund GP is authorized and charged to protect those interests only as consistent with the purpose of the Fund.  And as explained, under that purpose, the Fund's Property Partnership Interests have always been valued as sunsetting with a ROFR disposition.  Because the partners understand and intend the Property Partnership Interests will terminate with a ROFR disposition, it seems to me that an improperly exercised ROFR does not change the value of the Fund's Property Partnership Interests, and so cannot constitute a material adverse event on the Fund.  Consequently, failure to correct or

---

[354] *See Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1064 (Del. Ch. 2006) (finding where the parties contracted for a limitation of liability, "the Buyer may not escape the contractual limitations on liability by attempting to show that the Seller acted in a reckless, grossly negligent, or negligent manner"); *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, 268 A.3d 198, 216 (Del. 2021) (characterizing a material adverse effect as a high bar); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 738 (Del. Ch. 2008) (describing proving a material adverse effect as a "heavy burden").

[355] *See Rural/Metro*, 102 A.3d at 252.

[356] Fund LPA §§ 6.4F, 6.8E.

rescind an improperly exercised ROFR would be exculpated due to the absence of a material adverse effect on the Fund.

DLE theorizes there is other value that can only be realized if DLE can stop the exercise of the ROFR, and in turn the Disposition.[357] DLE's own projections and admissions at trial belie this trial theory of "other value," particularly combined with the projections called for by the Fund LPA.[358] And I analyzed the consent requirements and concluded DLE does not have an applicable or meaningful consent right om the context of a ROFR disposition, so it cannot impose its unwillingness to sell on the Property Partnership.

The decision not to challenge the Disposition, even if it were a breach, is exculpated because that decision did not, and perhaps cannot, create a material adverse effect on the Fund.

### E. Upon A Final Judgment Not Subject To Appeal, Fund GP Will Be Entitled To Damages, Costs, And Attorneys' Fees.

If this opinion's conclusions become a final judgment not subject to appeal, Fund GP will be entitled to damages and all reasonable costs and expenses, including

---

[357] *See Clarifying Nonprofit Purchase Rights* at 1169 ("In all cases where a nonprofit holds a Section 42 ROFR, these various investor efforts can only succeed if the nonprofit cannot successfully acquire the property pursuant to the ROFR.").

[358] Fund LPA § 3.3A(ii); JX004 at HUDSON00018773; JX011 at DLE_0005420; Trane Tr. 520–22; JX037 at DLE_0004085; JX089 at DLE_0001819; JX014 at DLE_0007799–801; Chiusano Tr. 390, 392–98; 400–01, 405–06, 410–11.

attorneys' fees under Fund LPA Section 7.2B.  Section 7.2B provides, in pertinent part:

> [I]f it shall thereafter be determined by a final judgment not subject to appeal or the execution of an agreement by the General Partner and the Investor Limited Partner [who sought removal] that no Cause for such removal existed, then the Investor Limited Partner shall be obligated to pay to the General Partner an amount equal to the sum of (i) the fair market value of the General Partner's Interest (as determined by the applicable court), (ii) any and all damages determined by the applicable court to be due to the General Partner from the Fund or the Investor Limited Partner as a result of such wrongful removal by the Investor Limited Partner and (iii) all reasonable costs and expenses (including attorney fees) incurred by the General Partner in connection with such removal.[359]

Fund GP successfully challenged a purported removal by DLE where no Cause for such removal existed.[360]  For the same reasons, DLE is not entitled to damages under Section 7.2B.  Upon a final judgment, DLE must pay for Fund GP's damages, expenses, costs, and fees.

Pursuant to my July 9, 2021 Order, this matter is bifurcated with respect to damages.[361]  But Fund GP's award under Section 7.2B may only be considered after entry of a final judgment not subject to appeal.[362]  I invite either a stipulated implementing order reflecting a designation of this opinion as a partial final

---

[359] Fund LPA § 7.2B.

[360] D.I. 168 at 9; D.I. 185 at 57.

[361] D.I. 47.

[362] Fund LPA § 7.2B.

judgment under Rule 54(b), or a motion for such designation.[363]  After the time for appeal has passed or a final and nonappealable judgment in Fund GP's favor is entered, the parties should confer as to the manner in which they would like to present their submissions to the Court on the issue of Fund GP's award under Fund LPA Section 7.2B, and inform the Court by joint letter how, and on what timeline, they propose to proceed.

## III.   CONCLUSION

For the reasons stated above, I find for Fund GP on all counts and counterclaim counts.  DLE lacked Cause to remove Fund GP as general partner because DLE failed to demonstrate Fund GP breached its fiduciary or contractual duties.  The Default Notice is invalid, and Fund GP remains the general partner of the Fund.  Fees are contractually shifted in favor of Fund GP; this Court will determine any remaining damages after entry of a partial final judgment not subject to appeal.

---

[363] Ct. Ch. R. 54(b).